## OF THE

## Supreme Court of Florida,

### AT

## JANUARY TERM, 1853,

### HELD AT TALLAHASSEE.

---

DAVID BARROW, APPELLANT, vs. WILLIAM BAILEY, ADMIN-
ISTRATOR DE BONIS NON of JOHN BELLAMY, DECEASED, RE-
SPONDENT.

1. If a creditor seeks the aid of a Court of Equity against the real estate of his
debtor, he must show a judgment at law creating a lien upon such estate;
and if he seeks such aid in regard to personal property, he must show an
execution, sued out and pursued to every available extent.

2. Upon a proceeding in *scire facias quare executionem non*, two writs succes-
sively issued and returned *nihil*, are equivalent to one writ returned *scire
feci*, and the Court may, upon such returns of *nihil*, proceed to award exe-
cution.

3. When such writ of execution is awarded upon a return of *scire feci*, the de-
fendant is concluded by the judgment; but when it is awarded upon two re-
turns of *nihil*, the defendant may afterwards present his defence by *audita
querela*, or upon motion to the Court, and may have the full benefit thereof.

4. Inadequacy of price, in a sale of property where the vendor is greatly indebt-
ed, is a mark or badge of fraud, and, when associated with other circumstan-
ces of suspicion, may be conclusive. Where, therefore, a vendor who was
largely indebted, and embarrassed by the pressure of his creditors, sold his
entire estate, real and personal, to a friend and relative whom he summoned
from a distance to make the purchase, at a price considerably less than the
fair market value of the property, and less than the sum of his debts, the

conferences between the vendor and purchaser during the negotiations being secret, and no appraisement by or reference to any third person on the question of values, and the avowed intention being to prevent the property from being sacrificed by creditors at sales under legal process; it was held, that fraud might and ought to be inferred therefrom, and that the conveyance, in equity, should be considered valid only as to the consideration paid by the purchaser which was actually applied to the payment of the debts of the vendor, and that the overplus or residue should be held by such purchaser as a trust fund, for the benefit of the creditors of the vendor.

This cause was brought up by appeal from a decree of the Circuit Court of Jefferson County, made at November Term, 1852, by the Hon. J. Wayles, Baker, Judge, sitting in Chancery.

William Bailey, as Administrator *de bonis non* of John Bellamy, deceased, filed his bill against Henry Dogget and David Barrow, to set aside a sale made by Doggett to Barrow, as fraudulent and void as to creditors.

Doggett being largely indebted to the intestate of complainant, and being in embarrassed circumstances, in April, 1845, sold and conveyed to David Barrow all his property in Florida of every description, consisting of large tracts of land, plantation implements, crops, provisions, cattle, horses, and other stock, and one hundred and seventy-eight slaves, for the consideration of forty-five thousand dollars, and an annuity of five hundred dollars during the life of Doggett, who was then old and infirm. Barrow, who was the Brother-in-law of Doggett, was summoned to Florida by Doggett for the purpose of making the sale.

The bill alleges inadequacy of price, and other badges of fraud, and charges that the sale was made with the intent to hinder, delay and defraud creditors.

The answer of Barrow admits his knowledge of the debt in favor of complainant's intestate, the sale to him, and his possession of the property, but denies that there was any fraud in the transaction. He avers that to prevent a

sacrifice of the property, in connection with his esteem and friendship for Doggett, he was induced to make the purchase.

The material facts in the case will be found in the opinion of the Court, to which reference is made.

*James T. Archer* and *M. A. Long* for appellant.

*A. E. Maxwell* and *M. D. Papy* for appellee.

THOMPSON, *Justice,* · delivered the opinion of the Court.

William Bailey, as administrator *de bonis non* of the estate of John Bellamy, deceased, brought his bill of complaint on the equity side of the Circuit Court against the appellant, David Barrow, and one Henry Doggett, for the purpose of setting aside an alleged sale and conveyance by the latter to the former, of all the grantor's real and personal property in Florida, as fraudulent and void as against creditors. The Court below made a decree in favor of the complainant, which will be hereafter noticed, from which the defendaut, Barrow, has appealed to this Court. To a correct understanding of the merits of the present controversy, it seems important to advert to the history of the debt claimed by the respondent here to be due to the estate of his intestate; and also to the facts and circumstances which preceded and attended the sale and conveyance of the property, which is complained of. It appears that in January, 1839, Doggett purchased from respondent's intestate a tract of land in Jefferson County containing 1203 acres, for the price of $20,000, payable in January, 1848, the interest on which sum, reserved at the rate of ten per centum per annum, was payable annually, commencing with the 1st of January, 1840, when the first payment of interest fell due. Doggett, however, was to have the privilege of pay-

ing said principal sum within the term of credit, provided the sum was so paid in sums not less than $5000 at any payment. A bond in the penalty of $40,000 was executed and delivered by Doggett to Bellamy, with condition to perform the said agreement; and a bond with like penalty of $40,000 was executed by said Bellamy to Doggett, with condition to convey the lands so contracted for on payment of the purchase money and interest, as stipulated. It further appears that, in the summer of 1843, no part of the principal or interest of said debt having been paid, and while Doggett was absent from the State, Bellamy, in consequence of some apprehension as to the safety of his debt, (arising, it is supposed by one of the witnesses, from some thoughtless language of a nephew of Doggett,) sued out an attachment for the amount then due, which was levied on all Doggett's slaves; and at the fall term of that year, of Jefferson Superier Court, Doggett confessed judgment for the penalty of the bond, and agreed that execution should issue thereon for $15,234.94, which sum included $5000 of the principal debt, and the annual interest on the whole sum up to 1st January, 1843.

The affairs of Doggett, some time in this year, or perhaps prior thereto, became much embarrassed. It seems he had become involved, as security and endorser for other persons, to a considerable extent, and that some sixty or seventy thousand dollars had been coerced from him by this class of creditors, which had consumed all his available cash resources, while his individual creditors had been indulgent, and their claims had now become, by the increase of interest, very formidable and onerous in his view, as they were in point of fact. The service of the attachment, it is said, added greatly to his mental distress. His embarrassments were enhanced by his infirmities, arising from his advanced age and disease, which tended to incapacitate

him from giving that attention to his property, from the is-
sues of which only could he expect to extricate himself, if
his creditors continued indulgent; and if they could not in
justice to themselves, or would not, from any other cause,
then only by a sale of the whole or a part of his property,
according to the exigency of the case.

Early in the year 1845 John Bellamy died, and adminis-
tration upon his estate was committed to his son, William
Bellamy, who caused the execution awarded on the 8th of
November, 1843, in favor of his intestate against Doggett,
to be levied on the slaves of the defendant in the County of
Leon. Three other executions were also levied on the same
property, and the sale thereof was advertised for Monday,
the 7th of April, 1845. Doggett, prior to that day, viz: on
the 29th day of March, after, as it is said, he had made, for
a year previously, various efforts to sell his property, some
of which will be noticed more particularly hereafter, con-
cluded an agreement for a sale with the appellant, his bro-
ther-in-law, and a resident of the State of Louisiana, and
who had been invited by Doggett to Florida, for the pur-
pose of extending relief to him, or of [purchasing the prop-
erty. The conveyance bears date on the 3d of April, and
was proved and recorded in the office of record for Leon
County on the 5th, and in that of Jefferson County, on the
7th of April. By this instrument, Doggett, for a pecunia-
ry consideration specified therein, bargains and sells, and
conveys to the appellant, Barrow, his heirs and assigns,
&c., " the whole of the property of the said Doggett of ev-
" ery kind and description whatsoever, lying, situate and
" being within the State of Florida," and then proceeds to
particularize, under a videlicit, the plantation in Leon
County, containing 2000 acres of land, known as the Home
Place; sundry detached parcels of land in the same Coun-
ty, containing in the aggregate 480 acres; the plantation

in Jefferson County, known as the Partridge Lands, and one additional eighth of land, containing in the aggregate about 712 acres; all the lands of said Doggett situate lying and being in Madison County, and not otherwise or more particularly described, or the quantity in acres specified: together with all the crops of every kind and description whatever, corn, fodder, peas, oats, sugar, cane, potatoes, furniture, &c., both in the Counties of Leon and Jefferson, together with all the farming implements, blacksmith and carpenter's tools ; also, all the stock, consisting of horses, mules, hogs and cattle ; also, one hundred and seventy-eight slaves, specified by name.

Upon the execution of this conveyance, Barrow went into possession of all the property specified therein except one servant, Hillyer, who was retained by Doggett, and, with the consent of Barrow, carried to North Carolina, where he remains in the possession of the vendor. It is. this sale and conveyance which has given rise to the present controversy ; but before the Court proceeds to the consideration of the question arising thereon, it is deemed proper first to dispose of the last point made in the argument of the appellant's counsel.

It is contended on behalf of appellant that the respondent, Bailey, is not in a position to claim the aid of a Court of equity. The general rule of equity undoubtedly is, that if a creditor seeks the aid of the Court against the real estate of his debtor, he must show a judgment at law creating a lien upon such estate : and if he seeks aid in regard to personal property, he must show an execution sued out and pursued to every available extent. Brinkerhof vs. Brown, 4 John's Ch. R., 676 ; Shirley vs. Watts, 3 Atk. R., 200. And if respondent, Bailey, does not occupy the position of a judgment and execution creditor, he cannot have the relief he asks for, even if otherwise well entitled

thereto. It will be recollected that, in 1843, judgment was rendered against Henry Doggett in favor of the respondent's intestate, for $40,000, the penalty of the bond he had executed to secure the price of the land purchased, on which, by consent of parties, execution was then awarded for part of the principal debt, and the arrears of interest due up to the first of January, 1843, which was paid, as will be hereafter noticed; the judgment standing, according to the provisions of the statute 8 and 9 Will. 3, c. 11, § 8, as a security for future breaches of the condition of the obligation.

In 1848, the residue of the principal sum falling due, ($15,000,) and the instalments of interest stipulated to be annually paid, remaining due and unpaid since the 1st of January, 1843, the respondent, Bailey, to whom administration *de bonis non* of John Bellamy had been committed, sued out a *scire facias* to revive the judgment of 1843, suggesting a further breach in the non-payment of the aforesaid sums, and praying an award of execution therefor, according to the directions of the statute before mentioned; which writ was returned *nihil;* a second or *alias* writ, sued out upon the return of the first, was also returned *nihil,* and thereupon, the two returns of *nihil* being considered equivalent to a return of *scire feci,* judgment of execution was awarded for the sum of $23,859, on which the Sheriff has returned, "no property found." It is now argued that the respondent has not shown a proper judgment and excution at law—that the *fiat* on the *scire facias* was rendered without any actual notice to Doggett, and is therefore simply void.

A *scire facias* is a writ necessarily founded upon some matter of record, and must issue out of the Court where that record remains. Tidd Pr. (8th Ed.,) 1139, Foster *Sci. fa.,* 1. In some cases, the issuing of the writ is the com-

mencement of an original action, and in which it is in the nature of an original action. Co. Lit., 296,a. Burr. vs. Atwood. 1 Salk. R., 89; as where it is brought on a recognizance, or by the Government to repeal letters patent, or to resume the grant of a franchise. Foster, 12. But in other cases, where the writ is founded upon the judgment of a Court of record, and it is intended to bring in a new party, or to have execution upon the judgment, it is a *judicial* writ, to warn the defendant to plead any matter in bar of the execution. In these cases, it is only a *quasi continuation of the former suit*, brought merely to revive the former judgment, and may be properly called a writ of execution. 2 Tidd Pr. (8th Ed.,) 1140, Philips vs. Brown, 6 Term R., 284. It is, however, in all cases considered in *the nature of an action*, because the defendant may plead to it any matter in bar of the execution upon the original judgment. O'Brien vs. Ram. 3 Mod. R., 189. The *scire facias* in the present case, was, therefore, a judicial writ to continue the effect of, and have execution of the former judgment, and this is fully illustrated by the form of the judgment rendered thereon. The statute 8 and 9, Will. 3, says Sergt. Williams, does not direct any judgment to be entered for the damages assessed for the further breach, &c.; therefore, it should seem there can only be one judgment, namely, the old judgment for the debt, and, 5, s., damages for the detention, and, 40, s., costs, together with the costs of increase. And in Hankins vs. Broomhead, (3 Bos. & Pul. R., 607,) it was so held in the Exchequer Chamber, and a second judgment for the damages assessed upon an inquisition, was reversed as erroneous. I Wm. Saund. R. 580. The form of the judgment upon *scire facias* in such a case, on a return of *scire feci*, where the defendant pleaded thereto in bar of execution, is thus given in Tidd App., 515;

"Therefore it is considered, that the said plaintiff " have his execution against the said defendant of the dam- " ages aforesaid, according to the force, form, &c.  And " it is also considered by the Court here, that the sa'd " plaintiff do recover against the said defendant for his " costs and charges by him laid out about his suit in this " behalf, on occasion of the said defendant having pleaded " to the said writ of *scire facias,* by the Court here ad- " judged," &c.

If it is upon two returns of *nihil,* then that fact is stated and the default recorded, and execution being a- warded, there is no judgment for the costs of the suit and proceedings therein.

Our statute, to which allusion was made upon the argu- ment, provides for the mode and manner of serving orig- inal process, that which commences or institutes a suit for the first time; and is silent as to the service of *mesne* pro- cess, such as a *scire jacias,* which is the continuation of a suit already instituted.  Resort must, therefore, be had to the common law for the rules to govern the subject; and on examination, all the books of practice inform us that two writs of *scire facias,* with returns of *nihil* to each, are deemed equivalent to one writ returned *scire feci.*  See Tidd Prac., 1124, 2 Sellon Pr., 196, citing 2 Inst., 472, and Andrews vs. Harper, 8 Mod. R., 227; 2 Arch. Pr., 83, citing Yelv. R., 88-122.  And this principle is recognized by the Courts of several of the States of the Union.  In New York, in Cumming vs. Eden, 1 Cowen R., 70; in Pennsylvania, in Chambers vs. Carson, 2 Whart. R., 9; in Indiana, in Kearns vs. The State, 3 Blackf. R., 334; and in North Carolina, in Woodfork vs. Broomfield, 1 Murph. Rep., 187.  In some of the States it is recognized by statute, with some modifications, as Virginia, Ohio and South Carolina.  See Lee vs. Chilton, 5 Munf. R., 407,

3*

Dunlevy vs. Ross, Wright R., 287, Grimke, Ex., vs. Magrant, 2 Brev. R., 202. Upon this point, the service of the writ of *scire facias*, Mr. Sellon observes, that although the intent of the *sci. fa.* is to give the party against whom execution is about to issue, notice or warning thereof, yet by the general practice it is wholly defeated, for the defendant may be summoned or not as the party thinks fit; and indeed the usual way is to revive the judgment without giving the party any notice." 2 Sellon Pr., 199. The allowance of such a course of practice unexplained, would seem to speak a reproach upon that system of law which claims to be founded on reason and natural justice; and the explanation seems to consist in the distinctive difference between the force and effect of an award of an execution upon a return of *scire feci*, and an award upon two returns of *nihil*, in other words, without notice to the defendant. In the first case, if the defendant does not appear, but suffers judgment to go by default, he is forever concluded from any plea or defence which he might have urged. Day vs. Guilford, (1 Lev. R., 41.) But if the Sheriff returns *nihil*, on which an execution is awarded, the defendant shall have an *audita querela*, in which he may present his defence, for, not being warned, he was not bound to appear. See Fitz. Nat. Brev., 104. According to modern practice, where there has been no *scire feci*, but only two *nihils*, the Court will often relieve the party upon *motion*, and not put him to an *audita querela*. Anon, 1 Salk Rep., 93, Wicker vs. Creamer, 1 Salk. R., 264, Wheaton vs. Richardson, 2 Stra. R., 1075. If any reason exists for thus allowing an award of execution upon two returns of *nihil*, it is not stated in any case or book to which the Court has had access; but it is quite probable that it may have arisen from the restrictive principle before stated, *that the scire facias* can only issue out of the Court in which the

judgment was rendered, and in which the record remains; the application of which might oftentimes defeat a party of his remedy, if personal service was required in cases where the defendant had withdrawn himself and his property from the jurisdiction in which the judgment was rendered, or had secreted himself and his property within the same. At all events, the law has made such provision for permitting the defendant in such case to open the judgment and present his defence by *audita querela*, or upon motion, that the practice cannot work any injustice.

It might be questioned whether, as the judgment of November, 1843, for $40,000, the penalty of the bond, was a subsisting judgment, standing by force of the statute as a security for further breaches, if the proceeding on *scire facias* had been irregular, or if the plaintiff had sued out an execution on the judgment endorsed to levy the sum due thereon, without an effort to revive by *sci. fa.*, it would be an irregularity which the appellant here could take advantage of. In Moseley vs. Doe, *ex dem.* Edwards, (2 Fla. Rep. 429,) where an execution had been issued on a judgment, after the lapse of more than a year and a day, without revival by *sci. fa.*, it was ruled by this Court, that it was an irregularity only, of which the defendant in execution alone could take advantage. But here it is wholly unnecessary to pass upon the question, as the proceeding on *scire facias* was strictly regular, according to the rules of law, and consequently the writ of *fieri facias* awarded thereon is a legal and valid process, which being returned *nulla bona* by the proper officer, the respondent in the Court below was well entitled to seek the aid of a Court of Equity.

The main question in this case is upon the sale and conveyance before mentioned, which is impeached as fraudulent and void as to creditors.

The existence of any actual fraud, of any meditated or intentional design on the part of the debtor and grantor, Henry Doggett, known to, or participated in by, the appellant, to hinder, delay or defraud creditors, is denied by the answer. Yet, without imputing any moral turpitude to either of the parties to this sale and conveyance, if those facts and circumstances are found to exist, and to have attended the transaction, which virtually and indirectly operate the same mischief, and which would, in contemplation of law, be deemed badges of fraud, or presumptions of ill faith, the result is the same; the inference of fraud arises, and the law pronounces the transaction, upon principles of public policy, fraudulent and void as to creditors. This is termed legal or constructive fraud. Gibson vs. Love, (4 Fla. R., 264, et seq.,) 1 Story Eq., § 258, 259, 349, 353, et seq. In Hadden vs. Spader, 20 Johns' Rep., 554, Platt, J., says :—" The defendant denies that there is " any fraudulent combination to delay or defraud creditors, " but in the same answer he admits a series of facts from " which both law and equity impute fraud." And so in Hendrick vs. Robinson, 2 John. Chancery R., 301, the Chancellor observes :—" The purchasers and vendors say " that this was an honest and bona fide sale, but do not the " facts which they all admit outweigh the declaration ? " And can a mere assertion be compared to the unequivo- " cal language of the facts and the necessary inference of " law ?"

Our statute of January 28th, 1823, against conveyances " to delay, hinder or defraud creditors," (Thomp. Dig., 215,) is a transcript from the British statute of 13th Elizabeth, c., 5, which latter act has always received a favorable and liberal interpretation in all the Courts both of law and of equity, in suppression of the fraud. It declares all fraudulent conveyances to be void; and whether a conveyance

be fraudulent or not, is by the statute declared to depend upon its being made "upon good consideration and *bona fide.*" Both requisites must concur, for although the conveyance be upon even a valuable consideration, it is not valid in point of law from that circumstance alone, for if it be made with intent to defraud or defeat creditors, it will be void. Cadogan vs. Kennett, Cowp. R. 432, 1 Story Eq., Jur. § 353, 369. The terms "good consideration," mentioned in the statute, have been held to include those founded upon motives of generosity, affection, or natural duty, as well as those founded upon money, marriage, or the like. Hence, family settlements and advancements to children are, under certain circumstances, good considerations as against creditors, where the settlor or parent is not indebted at the time ; but as against existing creditors, it is very doubtful if, in any case, any consideration which is not in law deemed valuable, will be allowed to prevail That eminent jurist, Judge Story, after a full review of the cases upon this point, declines to express his view as to the comparative weight of the judicial opinions in relation thereto. 1 Story Eq. Jur. § 354, 365.

Proceeding to the consideration of this case, the deed of conveyance of the 3d of April, 1845, from Henry Doggett to the defendant, David Barrow, on its face is liable to no impeachment; it conveys the property specified therein absolutely to the bargainee and his heirs, and is sustained by a legal consideration expressed of $45,000, paid to the bargainor, and of an annuity of $500 for his life. If it is justly obnoxious to the charge of fraud, it must be so from those facts and circumstances which preceded and attended the transaction, as disclosed in the answer of the appellant, and established by the proofs in the cause. Let us, then, briefly advert again to those circumstances. Doggett was at the time considerably embarrassed in his af-

fairs, and had been in this condition several years. Although not in fact insolvent, as will be hereafter seen, yet he believed such to be his condition—at least, such is the fair conclusion from his acts and declarations. Mr. Branch states that he (Doggett) never recovered from the levy of the attachment by Bellamy in the Summer of 1843, but ever afterwards regarded his affairs as irretrievable, and made various open efforts to dispose of his property to relieve himself. The expression of his fears, often repeated, that the payment of his debts would consume all his propty, and leave him nothing for his future support, is well established. Executions to the amount of $16,000 had been levied on his slaves in Leon County, and the time appointed for the sale was rapidly approaching. Destitute of cash resources to meet this urgent demand, he summoned the appellant, who is his brother-in-law, and who is represented as a man of wealth residing in Louisiana, to come to his assistance. The first call was ineffectual, for the want of sufficiently precise information as to the extent and character of the relief required. A second letter puts the appellant, according to the admission of the answer, in possession of the extent of the pressing money demand, and of Doggett's desire to sell the whole property to him. These letters are not produced by the appellant, and, in their absence, it must be presumed that they contained a full and detailed exposition of the pecuniary difficulties of of the writer, the amount of his liabilities, and the extent of his means, and of his hopes and fears as to his future maintenance and support. It is most natural to suppose, from the affinity between the parties, that Doggett was as full and unreserved in his communications with Barrow as he was with Mr. Branch, and the other witnesses. If it were otherwise, this would have been established by the production of the letters. Such was Doggett's condition,

and such the posture of affairs on Barrow's arrival in Florida to negotiate for the purchase of the property.

It is charged in the bill of complaint that the appellant well knew it would be impossible for Doggett to pay his debt to the estate of Bellamy, then due and to become due, after the transfer to him (Barrow) of all the property which Doggett owned in Florida. To this allegation, the answer is as follows :—" It is not true that respondent knew, " at the time of said sale, that said Doggett would be una- " ble to pay all his debts, because said Doggett declared " that he hoped and expected that he would be able to do " so, as he owned a large estate in North Carolina, consist- " ing of lands and slaves, &c., which he declared it was " his purpose to sell to the best advantage, so soon as prac- " ticable after he should arrive in said State." It is claimed on behalf of appellant that the answer, in this particular, is not only strictly responsive to the bill, but is an unequivo- cal denial of the allegation. *We* cannot think so; we can- not regard it but as a qualified denial, and at best but im- perfect as such. The rule with regard to the sufficiency of an answer to the allegations of a bill in equity, as stated by Ch. Kent, in Woods vs. Merrill, 1 Johns. Ch. R., 107, and recognized by this Court in Hunter vs. Bradford, 3 Fla. R., 285, is as follows :—" The general rule is, that to so "much of the bill as is material and necessary for the de- " fendant to answer, he must speak directly, without eva- " sion, and not by way of negative pregnant. He must not " answer the charge merely literally, but he must confess, " or traverse the substance of each charge positively and " with certainty ; and particular precise charges must be " answered particularly and precisely, and not in a gener- " al manner, even though a general answer may amount to " a full denial of the charges." See also Cowp. Eq. Pl., 313, 314, Mitf. Eq. Pl., 309, 316, Story Eq. Pl. § 852.

Now, it is very evident here, that the appellant's denial is qualified and explained by the alleged declarations of Doggett as to "his large estate, consisting of land and slaves, in North Carolina," from the sale of which he hoped and expected to be able to pay all his debts. Conceding the fact that Doggett did make the declaration to appellant which is imputed to him, as to this ownership of property in North Carolina, (and that he did so is most likely, as it is proved that he made a similar statement to Gov. Moseley,) was it known to the appellant to be true? or, if he had no personal knowledge on the subject, did he believe it to be true? And, if so, what were the grounds of his belief?—and did he act upon it, believing it to be true? The answer is silent on these points. If he had such knowledge, or entertained such belief, and acted upon it, he should have stated it, so as to avoid the inference, which seems irresistible, that he must have seen such a result was the necessary consequence of his purchase. The purchase was of all Doggett's known property; the price agreed to be paid therefor was less than the sum of all his debts, by the amount of this debt due Bellamy's estate; from Doggett's advanced age, and infirmities from disease, there was no prospect of his becoming able, from future exertion; then how was the debt to be provided for and paid? It would seem as if the appellant felt the full force of these facts and circumstances, when be prepared his answer, and sought to escape from the conclusion by relying on the simple declaration of Doggett. Should not Barrow, as a man of ordinary prudence, have reasoned thus:—If Doggett's assertion as to other property is true, and if his hopes and expectations thereon are well-founded, why should he manifest so much anxiety to secure the settlement of the small annuity of $500 for his future support? Why should the extraordinary provision be inserted, that

this annuity was to be payable to him or his order, and to no other person whatsoever? Whence the necessity of withdrawing $5000 from the sale of the Florida property, for the purpose of paying debts in North Carolina? And why should Doggett require to retain possession of the slave, Hillyard, after the sale? And if his services were necessary, in consequence of Doggett's infirmities, why not except him from the sale? The inconsistency of these things, compared with the truth of the fact asserted, must have been apparent. Was it true? If so, it was susceptible of proof; and yet, up to the time of the publication of the evidence in this cause, it rests on no stronger foundation than the unsupported declarations of Doggett. That the appellant knew of the existence of this debt due to Bellamy's estate, and that its payment was not fully provided for, is clearly admitted. He admits that it was not at all provided for in the appropriation of the proceeds of the sale; and he further admits that the land, of which the Bellamy estate still held the legal title, was an insufficient security, for he alleges, in his answer, offers to purchase it from the administrator of Bellamy's estate for a less price than the sum due; and says that it was not worth that price, but he was willing to give it because of its contiguity to the lands purchased of Doggett. The answer is insufficient to repel the inference of knowledge, from the surrounding facts and circumstances, and it must be taken that the allegation of the bill is sustained in this particular, and Barrow's purchase viewed as if he had full knowledge of the fact. But whether the appellant knew the fact or not, or whether he should have suspected and believed it to be so, is not, standing alone, of any importance; its materiality depends on other considerations; for one in failing circumstances, or even insolvent, has a right to sell or assign his property, except as against exist-

4

ing liens, for the purpose of paying his debts; and if he has the right to sell, of course, any one has the corresponding right to purchase. The only limitation upon the exercise of these rights is, that the sale and purchase be in good faith, and for a valuable and adequate consideration. If the appellant's purchase falls within this rule—if he purchased from Doggett in good faith and for a fair price, it is perfectly immaterial whether the vendor was embarrassed, or insolvent, or otherwise; or whether this condition of his affairs was or was not known to him; and so it is, also, wholly immaterial whether, by reason of preferences given by the debtor to some creditors over others, the sale and conveyance shall operate to the prejudice of a particular creditor, for, as was ruled by this Court in Gassett vs, Brown, (3 Fla. Rep., 260,) a debtor is entitled to distinguish between the claims of his creditors, and to prefer some to the entire exclusion of others. And this brings us to the question of inadequacy of price or consideration, raised by the pleadings in this case.

It is contended, on behalf of the appellant, that inadequacy of price is only objectionable, when so gross as to lead the mind to the conclusion that such a sale was not intended to be *bona fide*, but only fictitious and colorable. Such is the principle when the inequality is relied upon as the sole ground of objection; and when it is ascertained to be of this gross and manifest character, relief is given upon the ground of actual fraud, the fact being regarded as demonstrative of some gross imposition, or some undue influence. Judge Story states the principle thus:—"Mere in-"adequacy of price, or other inequality in the bargain, is "not understood as constituting, *per se*, a ground to avoid a "bargain, in equity; for Courts of equity, as well as Courts "of law, act upon the ground that every person who is "not, from his peculiar condition or circumstances, under

" disability, is entitled to dispose of his property in such
" manner and upon such terms as he chooses ; and wheth-
" er his bargains are wise or discreet, or profitable or un-
" profitable, or otherwise, are considerations not for Courts
" of Justice, but for the party himself to deliberate upon.
" Still, there may be such unconscionableness or inadequacy
" in a bargain, as to demonstrate some gross imposition, or
" some undue influence ; and in such cases, Courts of
" Equity ought to interfere, on the satisfactory ground of
" fraud. But then, such unconscionableness, or such inade-
" quacy, should be made out as would, (to use an expres-
" sive phrase,) shock the conscience, and amount in itself
" to conclusive and decisive evidence of fraud.    And
" when there are other ingredients in the case, of a suspi-
" cious nature, or peculiar relations between the parties,
" gross inadequacy of price must necessarily furnish the
" most vehement presumption of fraud." 1 Story Eq. Jur.,
§ 244, 246.    And this, we understand, would be the rule
of decision if Doggett was before the Court, seeking a re-
scission of the sale ; but here the case is different.    It is
the case of a creditor, who is seeking satisfaction of his
debt, and who complains of the joint act of Doggett and
Barrow on the ground that, by the sale and conveyance,
the property of the debtor has been improperly and in-
equitably put beyond the reach of his legal remedies ; and
the inadequacy of the price paid by the vendee, is present-
ed as one of the marks or badges of fraud.    In How vs.
Weldon, it was said by the M. R. :—" By the civil law, if
" half the value only of the thing had been paid, the sale
" would have been a mere nullity.    Our law differs from
" that ; but though the inadequateness of the value will not
" of itself be sufficient to set aside the contract, yet it is a
" very material ingredient, and, with other things, will go
" a very great way towards it."    2 Vesey, Sr., R., 518.

and to the same effect are the following cases : Stilwell vs. Wilkins, Jacob Ch. R., 280 ; Pope vs. Roots, 6 Bro. P. C., 184 ; Macormick vs. Malin, 5 Blackf. R., 509 ; Moore vs. Royal, 12 Vesey, Jr., 373 ; Boyd vs. Dunlap, 1 John's Ch. R., 478. Most of the cases usually cited on this subject, are those of suits between the parties to the conveyance, which always present stronger considerations to the Court to support the transaction for; conveyances purely voluntary are good, between the parties. But as the intent or purpose with which every conveyance is made, which operates prejudicially to creditors, is concealed within the bosoms of the actors, and the Court can only infer the motives and intents, from the outward acts of the parties thereto, when creditors complain of the invasion of their rights as such, and the disappointment of their just expectations, the Courts have scrutinized the transaction more closely, and have never required proof of the same extraordinary, gross and manifest disparity between the value of the property claimed to be sold, and the price paid as the consideration of the sale, as they have in the former case. In the case of Prosser vs. Henderson, (11 Ala., R., 484,) it is laid down by the Court, that, to justify an inference of fraud, from the price given for a slave purchased from an insolvent man, it should be clearly inadequate, evidently below the market price. And in the case of Borland vs. Mayo, (8 Ala. R., 104, 117,) which has been cited by both parties, the Court says :—" Inadequacy of " consideration, where the vendor is greatly indebted, is " recognized as a mark of fraud. True, it might not be " sufficient, *per se*, to authorize a sale to be annulled, un- " less the disparity between the true value of the property " and the price paid, or agreed to be paid, was so great as " to strike the understanding at once with the conviction " that such a sale could never have been made *bona fide,*

" But it may be a mark of fraud, where the difference is " not so great ; and when other circumstances are associa- " ted with it, they may be conclusive." See also Bozeman vs. Draughan, 3 Stew. R.; 243 ; McCaskle vs. Amarine; 12 Ala. R., 181. This ruling is, on its face, consistent with reason and with justice. In Partridge vs. Gopp, 2 Amb. R.; 588, Ld. Ch. Northington says :—" I think no man has " such a power over his own property, to dispose of it so " as to defeat his creditors, unless for consideration." The term consideration, must, of course, be intended to mean a fair and adequate price ; for if any consideration, which is valuable in its nature, though inadequate compared with the value of the property, be sufficient to sustain a sale by one greatly indebted, and especially when the sale is of all his known or visible property, it must be apparent that lit- tle has been accomplished, by statute, or by the adjudica- tions of Courts of Law or Equity, towards the protection of the rights of creditors. But understanding the rule to be very correctly laid down in Borland vs. Mayo, as the result of all the authorities upon the point, we proceed to the examination of the fact of inadequacy. It is charged in the bill that the price stated to have been paid by the appellant, as the consideration for the property conveyed. to him by Doggett, was and is wholly and entirely inade- quate and insufficient ; and it is worthy of remark, that the answer of the appellant does not directly assert that the price was full and adequate. On this point, the answer states, that he, the appellant, " did not regard the sale [*qu.* purchase ?] as a profitable one, at the time, situated as he was, and considering the condition of the property ;" and after stating matters in depreciation of the value, a- rising from negligent husbandry and previous ill-treatment of the slaves, he concludes thus :—" It may be true, that " said property, injured and out of repair as it was, might

" have been worth more to some person residing upon the
" same, and possessed of unemployed means to invest in
" its purchase, than the sum which respondent agreed to
" pay for the same ; but when the uncertain sum to which
" an annuity might ultimately amount, during the natural
" life of said Doggett, the difficulty and expense of respon-
" dent's raising money, and his remote residence from the
" property, are properly considered, he contends that it
" will appear that he agreed to pay a full, fair and ade-
" quate price." This averment, so cautiously qualified,
cannot be considered as meeting the allegation of the bill
of complaint. Whether, under the circumstances in which
he stood, the purchase was advantageous to him or not, he
being under no obligation to purchase, is not the question ;
the gravamen of the complaint is, that the price at which
he purchased, compared with the fair market value of the
property, was wholly and entirely inadequate and insuffi-
cient ; and clearly it is no answer to this allegation to say
that, placed as he was, he could not, prudently, or advan-
tageously to his interest, afford to pay a larger price than
he did pay. The tenor of the answer, in this respect,
would seem to imply a doubt on the mind of the appellant
himself, whether he occupied, on this point of the case, any
very strong position.

In ascertaining the value of the property, as well as the
price or consideration paid, the Court has reason to com-
plain of the poverty of the proofs. This defect, however, is
common to both parties, and but for the admissions of
counsel upon the argument, in aid of the data furnished by
the record, we would have found no little difficulty in
coming to a satisfactory conclusion. Of the property con-
veyed, there were one hundred and seventy-eight slaves ;
the value of those on the plantation in Jefferson County,
one hundred and sixteen in number, is estimated by one

witness, (Teat,) at the average price of $300 each.   Another witness, speaking of the general price of slaves, and disclaiming all particular knowledge of those in question, fixes the market price at an average of $275.   It is true that Dr. Elliott, who claims to have a personal knowledge of these slaves, speaks in very disparaging terms of them; he describes them as sickly, feeble, &c., the result of illtreatment, and insufficient feeding and clothing; but the testimony of Teat, who was the overseer of Jefferson County plantation for the years 1843 and 1844, and whose term of service expired just three months before the sale, is in direct and positive contradiction to the statement of Elliott.   And Mr. N. Thompson, a near neighbor of Doggett, and who was a frequent visitor at his house, examined by appellant, must be considered as confirming and fortifying the evidence of Teat.   He is asked—"Do you or "not, know the condition of the plantation and negroes, "and other property, sold by the defendant, Doggett, to "said Barrow, at the time of the sale?   Were the planta- "tions in good repair, or greatly dilapidated?   Were the "said negroes in good health, or were they sickly, feeble, "badly fed and badly clothed?"   And he answers, "that "the general appearance of the plantation, negroes, &c., "was about the same as the neighboring plantations."   The testimony of Mr. Branch has been relied on as supporting the testimony of Dr. Elliott; but this evidence is very uncertain and indefinite; he says he had no personal knowledge of the property, or its condition—that Doggett's negroes "were said to be an unusually sorry lot."   This is not stated even to have been general reputation; nor does he say from whom he received the information.   It may have been from the appellant, or from Dr. Elliott, in which case it would not add to the value of the statement of either.   It would rather seem, from the deposition, that he

was simply echoing the allegations of Barrow, for he adds,
" and Barrow urged these as reasons for not desiring to
purchase, except on favorable terms." The Court is dis-
posed to take the average given by Gov. Moseley, $275, as
the fair average value of Doggett's slaves, especially as it
is asserted in the answer that there were but few small.
children in the gangs. This will give, as the value of the
slaves the sum of            -        -        -      - $48,950
The plantation in Jefferson County is proved by
Gov. Moseley to be worth from $6 to $7 per a-
cre ; it contained, including the adjacent eighth of
land, 712 acres. Taking a price between the
two sums given, say $6.50 per acre, the value
will be        -        -        -       -,       ..       - $4,628
The other personal property, consisting of 42 hor-
ses and mules ; 4000 bushels of corn ; 22,000 lbs.
of bacon, and other provisions ; stocks of cattle
and hogs ; wagons, and other plantation tools and
utensils, &c., &c., taking the valuation of Teat as
to that on the Lake plantation, less the excess of
4000 bushels of corn, and estimating that on the
Home place on the same basis, it will amount to
the sum of        -        -        -       ..       - $7,178
                                                          ————
The aggregate of which items amounts to        - $60,756
which are all the values proved by the witnesses.

To the sum so found, may be added the value of the
Home place, containing 2000 acres, which is not at all
proved, but which counsel for appellant estimate at the
price or value of $2.50 per acre, which certainly must be
a low estimate for a plantation on which was kept a gang
of 62 slaves, and a team force of twenty horses and mules
for its cultivation ; this will amount to the further sum

of   -        -        -        ,        -        -        -        $5,000
Adding also the several detached tracts of land
in the vicinity of the Home place, described in
the deed, and containing, from description, 480 a-
cres, the specific value of which, although not
proved, is now estimated at the same price, $2.50
per acre, making  -        -        -        -        -    $1,200

and the aggregate of these sums,  .        -        -    $6,200
added to the former aggregate, will make the value of the
whole property, so far as proved and estimated, the sum
of $65,756. The Court cannot but think that the value of
the Home place is greatly under-rated in the estimate put
upon it; and that, if proper care had been exercised in the
preparation of the cause for the hearing, the fact would
have been demonstrated, and the aggregate of values con-
siderably increased. The deed conveys other lands, by
the general description of "all the lands of said Doggett
lying and being in the County of Madison;" and the same
remissness is found with regard to this property. There is
no proof of quantity, quality, or value. And so also the
answer of the appellant admits that, although he declined
to accept from Doggett a transfer of his contract for the
purchase of the 1203 acres of land, and states that the
same was designedly omitted to be inserted in the convey-
ance, yet he went into possession of it, under Doggett, and
occupied and cultivated 500 acres from the time of the
purchase, and at the time of his answer, was still in pos-
session. This use and occupation of 500 acres of land, so
acquired in right of Doggett, was of some value, and may
be fairly considered, as it is very plain, from the answer,
the appellant considered it, an acquisition consequent up-
on the purchase of the estate, to a part of which it was
contiguous.

5*

Having thus ascertained the value of the property sold, it now remains to look to the price or consideration paid therefor. Upon the argument, much stress was laid upon the allegation in the answer of the appellant, that he "gave more than any of the creditors would offer ;" and upon the fact that the property had been offered for sale to sundry persons, without success. As to the allegation of the answer, it cannot, on any just principle, form the criterion of value. The proofs show that Doggett offered all his property for the consideration of the payment of all his debts, and the settlement upon himself of an annuity of five or six hundred dollars per year, during the term of his natural life. The offer was made to Messrs. Branch and Noah L. Thompson, and to John W. Cotten. Did any of them refuse to accept the offer because the property was not worth that price? No such ground of refusal was assigned by either. Mr. Branch states that his brother declined accepting the offer because " they had no money to " pay for it, and were unwilling to incur so large a debt " for an uncertain chance of even a good speculation." Mr. Thompson assigns no reason for the refusal of the offer by himself and by John W. Cotten ; and if resort is to be had to conjecture, as to what the cause probably was, it may with as much propriety, be supposed that they were deterred by the same prudential consideration, as to suppose they declined because the price demanded exceeded the true value. These offers and refusals are not sufficient to furnish any indication as to the fair market price. And so with the offer said to have been subsequently made by the appellant to Dr. Mitchell, to take the bargain off his hands. There is no doubt but that the offer spoken of by Mr. Branch, is the same which is mentioned in the answer of appellant, and reference will be had to the latter, as being the most precise statement of the occurrence. The of-

fer is there stated to be, that he would transfer the purchase to any one who would refund to him his expenses, and pay a reasonable remuneratian for his labor, time and trouble, in visiting Florida, and making all the arrangements and examinations which were previously recited in the answer. It does not appear what was the amount alluded to as expenses, and reasonable remuneration for labor, time, and trouble; and whether, if stated, any one would concur with the appellant, on the subject of the reasonableness of the amount; nor why Dr. Mitchell rejected the offer. In fine, it proves nothing; not even Dr. Mitchell's opinion as to the value, for it is impossible to say what was the motive of his refusal. It may have been that he foresaw a troublesome litigation in the future, and was not willing to pay a premium for the right to participate in it.

The consideration of the purchase stated on the face of the deed, is the sum of forty-five thousand dollars, paid at or before the execution of the instrument, and an annuity of $500 during the life of the vendor. The original answer, filed on the 20th April, 1849, responding to the discovery prayed for in the bill, states that "the manner and times "of paying the said sum of $45,000, was not set down spe-"cifically in writing, but was verbally agreed upon," as follows, viz: $15,234.94 to be paid to Bellamy's estate, and the sum of $2,395.98 to be paid to Noah Teat, which sums were to be paid in satisfaction of executions then levied, and were so paid; the further sum of $5,000 was to be paid to Doggett, to be applied to the discharge of debts alleged to be due in North Carolina, and was so paid to him; and the residue, amounting to $22,379.78, was to remain in the purchaser's hands, without interest, until the same could be applied, under the direction of Doggett, to the discharge of certain other debts, the amount of which

could not then be ascertained, and one of which was in litigation.

These debts are stated as follows : To Holbrook, Nelson & Co., of New York, about $2,550 ; to J. &. L. Branch, $1,250 ; To Long & Walker, $1000 : to John B. Doggett, about $250 ; to William D. Moseley, $1,261.24 ; to the Union Bank, stock bond and mortgages amounting to $16,800 ; and sundry other debts, amounting to $12,263.87 ; and to indemnify John W. Cotten, in whole or in part, against a note for about $15,000, due to Dr. Mitchell, and on which Cotten was security for said Doggett. But in no event were the payments made, and to be made, to exceed the sum of $45,000, specified in the deed ; and if the obligation could be discharged with a less sum, the appellant was to be entitled to the residue, as a compensation for his trouble and personal expense in superintending the adjustment thereof. But by a supplemental answer, filed on or about the 20th of October, 1850, it is alleged by the appellant that there was a written agreement, exhibiting the terms of the said sale and purchase, and the manner and times of paying the said purchase money, which agreement had been, at the time, left in the custody of Mr. Branch, one of his solicitors, who was absent when the original answer was prepared, and the existence of the paper was utterly forgotton by the appellant, until found by Mr. Branch, and returned to his possession. By this agreement, the sum of $45,000 was to be thus paid : In cash, $20,500 ; to Dr. J. W. Mitchell, a note on which Cotten is security, for between $15,000 and $16,000 ; and lastly, to pay a sum not exceeding $10,000, in discharge of the debts due the Union Bank.

The answer also corrected various errors in the pay-ments alleged by the original answer to have been made to creditors. It is certainly extraordinary that the fact of

the existence of this paper, which was the only evidence of the appellant's obligation to pay a large sum of money, as well as the mode and manner of payment which it prescribed, should have passed so completely from his memory; for it will be observed, on comparison of the two statements, that there is a material difference between them. But the explanation given in the supplemental answer, accounting for the excess of the cash payment beyond that stipulated for, ($26,871 having been paid, instead of $20,-500,) presents a still more strange state of the case. It is stated, that " this excess of payment arose from various " causes ; in the first place, respondent acted upon the hy-" pothesis that the agreement was as is stated in the orig-" inal answer, the written agreement aforesaid, owing, " probably, *to subsequent verbal conversations and agree-* " *ments,* having been entirely lost sight of." This allegation raises a well founded doubt whether the Court is yet in possession of the actual agreement, or that on which the minds of the contracting parties finally settled ; a circumstance in itself which tends to negative the good faith of the transaction. It does not appear from the evidence, or any admission in the pleadings, that any one was present during the negotiation between the parties, which resulted in this sale ; although the fact that such negotiation was pending, seems to have been known to several of the witnesses who have been examined. Nothing, therefore, can be known of what transpired during their interviews, save what they may think proper to disclose and make public. Nor does there appear to have been any reference to mutual friends or neighbors on the question of value. The advice given by Ld. Coke, grounded on the resolution of the Judges in Twyne's Case, (3 Co. R., 80,) to creditors who are about to accept satisfaction of their demands by a transfer of property from their debtor, to " let it be made

in a public manner, and before the neighbors, and not in private," &c. ; and "to let the goods and chattels be appraised by good people to the very value, &c.," would seem to be peculiarly appropriate to a case like the present, where the sale of the whole estate of a debtor greatly embarrassed, for the price contemplated, would be likely to produce insolvency. For, besides the ready reference to the witnesses to prove the good faith of the transaction, if impeached, such a course would be well calculated to disarm suspicion, even in the minds of creditors whose claims are prejudiced thereby. We do not wish to be understood as holding that such a course of conduct is necessary, but merely that the adoption or omission of such cautionary measure would not be without influence on the question of fraud or no fraud, in connection with other circumstances.

Proceeding in the examination as to the manner in which this consideration or price was actually paid ; it appears that the following sums were in discharge of the executions levied upon the slaves, and which constituted a lien thereon :

To Bellamy's administrator, for principal, interest and costs,        -        -        -        $13,696.84
To Teat, for same,        -        -        -        -        195.98
To Willis, for same, -        -        -        -        1,203.58
To Murphy, for same,        -        -        -        463.51

Making        -        -        -        -        $15,559.91
And there was paid to Henry Doggett, to be applied to the payment of alleged debts [due in North Carolina,        -        -        -        -        $5,000
Certain other payments are claimed in the original answer to have been made, but at what time is not stated; neither are they stated otherwise than from memory, the

vouchers being in the possession of absent agents, and which were to be subsequently produced; but which are not found in the record, nor any evidence in relation thereto, save that found in the testimony of Mr. Branch, who proves the payment to himself and brother of $1,250, and Long and Walker of $750. But as the fact of these payments has not been controverted in the argument, they will be assumed to have been made at or about the same time, viz:

| | | |
|---|---|---|
| To Messrs. Holbrook, Nelson & Co., | - | $2,550.00 |
| To Messrs. J. & L. Branch, | - | 1,250.00 |
| To Messrs. Long & Walker, | - | 1,000.00 |
| To the Sheriff, for John B. Doggett, about | - | 250.00 |
| To William D. Moseley, | - | 1,261.24 |

$6,311.24

And showing the entire cash payment to amount to $26,871.15.

It is contended, on behalf of the respondent, that this sum was all that Barrow really paid for the property; that the estate, being large, must have yielded a large annual income; and having had possession of the property for five years before any other payment was made, the subsequent payments were made out of the issues and profits made by him. The position is certainly plausible; but the payment of the Mitchell debt, as well as the sum to the Union Bank, being secured by the written contract, it is sufficient to give him the character of a purchaser for value to that extent. (Seward vs. Jackson, 8 Cow. R., 454.) In addition to this, the Union Bank debt was due, by mortgage, on a portion of the property conveyed. But the payments so made are not to be computed as of their full amount, in ascertaining the value or amount of the consideration paid. The payment to Mitchell of the sum of $15,955 having

been deferred for the period of four years, 11 months and 10 days, for the purpose of this investigation, the Court must ascertain the value of that sum, so deferred, at the time of the transaction, viz: the 3d of April, 1845. Assuming the value of money to be worth an interest of 8 per cent. per annum, the value of the sum of $15,955, deferred for the time specified, at compound interest, is $10,903.58, and at simple interest, is $11,432.71. Taking the latter sum as the most favorable to the appellant, the aggregate of consideration, as of the 3d of April, 1845, is increased thereby to the sum of $38,303.77.

It was also stated on the argument, by appellant's counsel, that at some period of time, intermediate the filing of the supplemental answer and the hearing of the cause in the Circuit Court, Mr. Barrow had discharged the debt due the Union Bank, by the payment of the sum of $8,500. Assuming this payment to have been made six years after the sale, and computing the value of that sum, so deferred, in the same manner, interest being calculated at 8 per cent, per annum, it will be found to be, at compound interest, $5,356.44, and at simple interest, $5,743.24. Taking the latter sum, and adding it to the former aggregate, it will make the sum of $44,047.01, which is the consideration price paid by Barrow to Doggett for the property conveyed, excluding the annuity, computed as cash, on the 3d of April, 1845.

To ascertain the entire consideration, the annuity is to be added; and here, again, the Court must complain of the want of sufficient data on which to form an accurate judgment as to the value.

The only information is that furnished by the answer of the appellant, in which Doggett is described as "diseased, old, infirm, and unable to superintend" his business; and, again, in another paragraph, "as an aged and infirm

man." The market value of an annuity, it is true, as ar-
gued by one of the appellant's counsel, is a matter capa-
ble of ascertainment by calculation, and, in older settled
communities than this, annuities are a frequent subject of
sale and purchase. The calculations of value, however,
are all based on the probable duration of life at the various
ages of man; to ascertain which, tables have been con-
structed, founded upon observations made in various parts
of the civilized world, as to the decrement of human life.
The evidence is deficient here in failing to furnish the
Court with the age of the annuitant, and also of the nature
or character of the disease, so that it might be ascertained
if it be one which is considered as tending to shorten or
render precarious the probable average duration of his life.
The Court must make a guess, however, and give the ap-
pellant the benefit of it. Assuming that Doggett was six-
ty-five years of age, an annuity for five hundred dollars for
his life, might have been purchased for about the sum of
$3,700. This is a liberal calculation; for an annuity for a
man of that age, in good health, is not worth more than
seven or eight years purchase, and Doggett is represented
as being exceedingly infirm, from disease. This sum add-
ed to the former aggregate, will make the whole price,
money and annuity, amount to the sum of $47,747, a sum
less than the value of the property, as proved and estima-
ted, by the sum of $19,009.

Upon the argument on this point, it was urged that, by
the terms of the agreement between Doggett and Barrow,
the latter was to pay, if necessary, to the Union Bank, a
sum exceeding that actually paid of $1,500; and also that
Mitchell claimed from Doggett a much larger sum than he
recovered, and which Barrow had good reason to believe
might have been recovered, and which he would, in such
case, have been bound to pay; and therefore, this contin-

6

gency should be taken into the account, and these sums being added to those actually paid, the aggregate thereof should be regarded as the true sum agreed to be paid. Concede this, together with the accuracy of the calculation made by the counsel for the appellant, and while it affords no aid to the appellant's case, (Ardglasse vs. Muschamp, 1 Vern. R., 237,) it furnishes proof that the property was in fact worth more than the estimate now put upon it; for no one can suppose, from the evidence in this record, that Barrow ever contemplated paying more for the property than he considered it worth; and yet the argument is, that he did agree to pay more than he actually paid, if certain contingencies happened. But as the contingencies did not happen, and no more was paid than has been before stated, what is to become of the excess, or overplus? It is claimed, in the original answer, that it is to enure to the benefit of Barrow, as a compensation for his "trouble and person- "al expense in managing the affairs of the said Doggett, "and superintending the defence of the litigation with "Mitchell, and other suits." There is no proof of any such agreement between Doggett and himself; and if there was, if it did not amount to the offence of champerty, it would savor so strongly of it, that the appellant would not be permitted to set up the agreement in any Court.

There is no rule in our law as to what disparity between the real value of the property and the consideration paid, will, in any case, constitute inadequacy of price; but the Court must ascertain this from the facts and circumstances of each particular case. We fully appreciate the difficulty of passing upon this question of inadequacy, and feel the full force of the remarks of Ld. Ch. Baron Eyre, in Griffith vs. Spratly, (1 Cox R., 383,) that the value of a thing is what it will produce, and admits of no precise standard; that it must be, in its nature, fluctuating and

dependent on many and various circumstances; and we would not undertake to pass upon the question, where the sale had been at public outcry, unless the price was such as would shock the conscience, or there was proof of conduct calculated to chill bidders, or other fraudulent intervention; nor in any case, even where the sale was by private contract, would we be disposed to " weigh the comparative values with golden scales." Adverting, however, briefly to the prominent facts and circumstances of the case, we find that the complainant in the Court below is a creditor whose debt is secured by a judgment of record, in favor of his intestate, before the sale and conveyance complained of. We find the debtor deeply embarrassed, yet possessing property more than sufficient to satisfy the demands against him, estimating the value at a fair market price; of advanced age, and infirm from disease; harrassed by the apprehension that, when his property shall have been applied to the payment of his debts, he will be left, in the evening of his life, a pensioner upon the charity of others; expressing anxiety, it is true, to make provision for the payment of his debts, yet evidently more anxious to provide for his future support and maintenance; finally disposing of his estate to a friend and relative, whom he had summoned from a distance to make the purchase, at a price considerably less than the market value, and less than the sum of all his debts, yet securing an annuity for his future support. Turning to the purchaser, the Court finds him fully apprised of the condition of his vendor's pecuniary affairs, and with notice of the existence of the debt due to Bellamy's estate, purchasing the entire estate, real and personal, of his debtor, for a sum in gross considerably below the market value, knowing that this debt was not fully provided for, and having no just reason to believe the debtor to be otherwise able to provide for its liquidation. Couple

with these facts the other circumstances, namely : that, although it was known that a negotiation was pending between these parties for a sale and purchase of property, yet that the conferences between them were secret; that there was no appraisement, or estimate of value, by any disinterested third person; the doubt, raised by the supplemental answer of the appellant, whether the Court is yet in possession of the last and final understanding and agreement of the parties in relation to the consideration of the sale ; the avowal of the design, by the purchaser, to prevent the property from being sacrificed by creditors, and the retention of the possession of one of the slaves which the deed professes to sell and convey; and then, if the disparity between the value of the property and the price agreed to paid therefor, as the consideration of the sale, be insufficient to "shock the conscience," or to furnish, of itself, conclusive evidence of fraud; if it would be wholly insufficient to enable the Court to grant relief to the vendor himself, if he were here asking for it, yet the Court cannot doubt but that the inequality is gross and manifest enough, combined with the other circumstances mentioned, to make the transaction, as against creditors, fraudulent, by construction of law; nor can we hesitate to declare it so.

It will be recollected that, in the computation of values, by which the disparity of $19,000 was ascertained, there was included, in the calculation of the consideration paid, the value of the annuity settled upon Doggett, amounting to $3,700 ; and there was also included therein the further sum of $5,000, which was paid to Doggett upon the sale, to be used, as it is said, for the payment of debts in North Carolina, but of the application of which, or even of the existence of any debts in that State, on which a presumption of such application might be founded, there is no evi-

dence. ˙ The aggregate of these two sums, added to the deficiency before mentioned, will make $27,700 ; and the effect of this transrction, as thus shown, was to withdraw that sum from the just claims of creditors, out of an estate of the value of $66,700. This conduct is wholly irreconcilable with that of one who is desirous to pay all his debts, and can only be accounted for upon the hypothesis of a design to hinder and defraud creditors.

From the facts and circumstances before alluded to, the purchaser must be taken to be privy to the intent, and so far as the payment of $5,000, and the payment for the annuity for four years, mentioned in the answer, should be postponed, if necessary, in favor of the complaining creditor. In Hawkins vs. Moffatt, (10 B. Monr. R., 81,) where a man greatly embarrassed sold all his interest in an estate, worth $1,169, for the consideration of $465, in discharge of debts, and ten years board, and clothing for five years, to be enjoyed after the sale, it was held to be manifestly fraudulent, and was declared void as against creditors. The transaction, in that respect, presented no stronger marks or badges of fraud than are to be found in this case.

The decree remains to be considered. At law, upon the question of the validity of a deed, or other conveyance, the Court can hold no middle course ; it must be decided on the single point of validity, and held to be either wholly good or wholly bad. If it is found to be fraudulent, the creditor comes in and avoids it all, without repayment of the consideration money ; but in Equity such is not the rule, except where actual fraud and covin are found to exist. Boyd vs. Dunlap, 1 John. Ch. R., 478 ; Sands vs. Codwise) 4 John. Ch. R., 536, 598. In Equity, where a security or conveyance is found to be constructively fraudulent, it is upheld in favor of one not guilty of any actual fraud, to

the extent of the actual consideration, and is vacated only as to the excess ; and so, when the property is of greater value than the consideration, the conveyance may be impeached as being voluntary, to a partial extent, and, if there be no actual fraud, will be sustained to the extent of the consideration, and vacated as to the residue, or the grantee be decreed to be, as to such residue, a trustee for creditors. Wright & Cooke vs. Stanard, 2 Brock. R., 314 ; McMeekin vs Edmonds, 1 Hill Ch. R., 294 ; Boyd vs. Dunlap, 1 John. Ch. R., 478 ; Wickes vs. Clarke, 8 Paige R., 161, 172 ; Herne vs. Meeres, 1 Vern. R., 465 ; Grove vs. Watt, 2 Sch. & Lef. R., 492 ; How vs. Weldon, 2 Ves. Sr., 516 ; Sandford vs. Wheeler, 3 Conn. R., 165. Chancellor Kent, in Boyd vs. Dunlap, expresses his approbation of this prinple of limited interference, by allowing the deed to stand as a security for any sum really due, or paid by the grantee, and observes that, " Nothing can be more equitable " than this mode of dealing with these conveyances, of " such indecisive and dubious aspect that they cannot either " be entirely suppressed or entirely supported, with satis- " faction and safety."

The decree pronounced in this cause, in the Circuit Court, seems to present an inconsistency in its several clauses. The first clause directs the arrears of the annuity secured to Doggett under the deed of the 3d of April, 1845, to be paid the creditor, William Bailey, to be applied towards the satisfaction of the debt due to the estate of his intestate, which would appear to be a proper direction, upon the assumption of the entire validity of the conveyance ; while the second clause declares the same conveyance to be fraudulent and void as against the complaining creditor, and the property specified therein, and conveyed thereby, to be liable to his execution, and directs a sale of the whole or such part thereof, under the

writ, as shall be sufficient to satisfy it. It is clearly erroneous, on the principles hereinbefore laid down, and must be reversed and set aside, and the proper decree entered in in this Court.

---

The following judgment was entered in this cause :

The Court having maturely considered the transcript of the record of the proceedings of this cause, and the arguments of counsel, and now being fully advised of its judgment, to be given in the premises, it seems to the Court here that the decree of the Circuit Court of the Middle Circuit, sitting as a Court of Equity, in and for the County of Jefferson, rendered in this cause, is erroneous, and should be reversed.

Therefore, it is considered by the Court here that the said decree be reversed and set aside.

And the Court here, proceeding to render such decree as the Court below ought to have rendered, for the reasons, and upon the considerations set forth in the opinion delivered herein, doth think fit and proper, and so orders and decrees, that the said deed of conveyance from Henry Doggett to the appellant, mentioned and specified in the bill of complaint, and other proceedings in this cause, and exhibited therewith, bearing date of the 3d day of April, 1845, is in construction of law deemed, and is hereby declared, fraudulent as to the rights of the complaining creditor, William Bailey, administrator. *de bonis non* of John Bellamy, deceased. And that, as against his claim, the said deed of conveyance be set aside as an absolute conveyance but to be valid to the extent of all such sums of money as have been in good faith advanced and paid, by the said David Barrow, on account of said purchase, and to stand,

remain and enure as a security, to the said David Barrow, for the same.

And the Court doth further order, that said David Barrow, as to the property, real and personal, conveyed in and by said deed to him, be, and he is hereby declared a trustee for the benefit of himself and the said William Bailey, administrator as aforesaid ; first, to reserve and receive for himself reimbursements for the sums of money advanced and paid by him as aforesaid ; and secondly, to pay, satisfy and discharge such sum as may be found due for principal and interest, and costs, upon the execution awarded by the said Circuit Court in Jefferson County, upon *scire facias*, on the 27th of November, 1848, in favor of said William Bailey, administrator as aforesaid, against Henry Doggett, after applying the nett proceeds of the sale of the land, made under the interlocutory decree of the said Circuit Court, passed in this cause on the 16th October, 1849; and lastly, retaining any overplus which may then remain for his own use and benefit.

And the said Court doth think fit further to order and decree, that it shall be at the election of the said David Barrow to pay, or cause to be paid, to the said William Bailey, administrator as aforesaid, or to his solicitor in this cause, the amount of his said debt and claim, principal, interest, and costs, on or before the first day of the next term of the Circuit Court of the Middle Circuit, to be held in and for the County of Jefferson, or to account before the said Circuit Court for the said property; and the issues thereof, as a trustee thereof, for the uses and purposes, and for the trust hereinbefore specified.

And this Court doth further order and direct, that if the said Barrow shall not pay or cause to be paid, to the said William Bailey, administrator, or his solicitor, the said debt aforesaid, on or before the expiration of the time lim-

ited as aforesaid, then and in that case, he shall be held, deemed and taken, to have elected to account for said property, and the issues thereof, as trustee, before said Court. And thereupon the said Circuit Court shall take effectual order by decree, according to the usual course and practice of Equity proceedings, that said David Barrow account as such trustee, and that the said property, real and personal, specified in and conveyed by said deed, be applied to the purposes of said trust, as herein declared. And the said accounting, and said application of the trust fund, be made according to the following principles, to wit: First, that said David Barrow be charged with the value of the personal property other than the slaves, computing interest thereon from the 3d day of April, 1845; that he be charged with a fair annual rent for the lands, and fair annual hire for the slaves, with interest thereon from the expiration of each and every year. Secondly, that he be credited and allowed for all payments and advancements by him made, for and on account of said purchase, with interest on each item, from the time of advancement and payment thereof as aforesaid. Thirdly, that the said lands and slaves, specified and mentioned in, and conveyed by, said deed of the 3d of April, 1845, with the issue and increase of the female slaves, be sold by and under the direction of the proper officer of said Court, at such time and in such manner, and upon such terms, as the said Court shall, by its decree, ascertain, direct, and appoint; and that the proceeds thereof be thus applied: First, to pay, satisfy and discharge the costs and charges of said sale, and of this cause, to be taxed and allowed according to the usual course of the Court. Secondly, to pay, satisfy, and discharge the balance, or residue, found due upon the account, to the said David Barrow for his advances and payments on account of said purchase, as aforesaid. And

7

thirdly, to pay, satisfy and discharge, the debt which shall be found due to the said William Bailey, administrator as aforesaid, upon his execution aforesaid, against the said Henry Doggett. And lastly, to render and pay the surplus, if any, to the said David Barrow; *Provided, however,* That if the proceeds of said sale be found insufficient to pay the said debt or claim of the said William Bailey, administrator as aforesaid, as well as all the balance found due to the said David Barrow, as aforesaid, then and in that case, the payment made by the said David Barrow to the said Henry Doggett, of $5000, on the 6th of April, 1845, and all payments made by him to said Doggett on account of said annuity, secured in and by said deed, be deferred, and postponed in favor of the debt, or claim of said William Bailey, administrator as aforesaid.

And this Court doth further order, that this cause be remanded to the said Circuit Court of the Middle Circuit, sitting in and for the County of Jefferson, and that this decree be certified to the said Court, and be entered on the record as the decree in this cause, and that such further directions, orders and decrees, be made by said Circuit Court in this cause, as may be requisite and necessary to carry out and make effectual the decree rendered herein: and also such other and further proceedings be had in this cause, as may be consistent with the opinion and decree of this Court, and in conformity with the usual course of proceedings in Equity.

And this Court doth further order and decree, that in this Court, each party pay his own costs, to be taxed by the clerk.