5 305
39 620

JOHN T. J. WILSON AND JOSEPH M. CLELAND, APPELLANTS, vs. LUKE LOTT IN HIS OWN RIGHT AND AS EXECUTOR OF MARY THOMAS, DECEASED, APPELLEE.

1. Fraud is not to be presumed, but must be proved; and this is the general rule, as well in equity as at law.

2. In equity, fraud will sometimes be presumed from the nature and subject of the bargain itself, being such as no man, not under some delusion, would make, on the one hand, and as no honest and fair man would accept, on the other; and it will be presumed from the circumstances and condition of the parties contracting; and these instances form exceptions to the general rule.

3. Where one greatly indebted, although not actually insolvent, with the avowed design of removing from the country, makes a sale of all his property, real and personal, receiving payment partly in cash, partly in a debt due by him to the vendee, and for the residue the promissory notes of the vendee, which were subsequently paid, and possession of the property sold followed and accompanied the conveyance: HELD, Not to constitute evidence of fraud although it appeared that the vendee was the mother-in-law of the vendor; and that, owing to subsequent misconduct of the vendor, the proceeds of the sale were lost to his creditors.

4. Where it appeared that subsequently to the sale, upon the entreaties of the vendee, who was unwilling to be separated from her daughter, and upon her promise to remember her grand children liberally in her will, the vendor yielded to the said solicitations and promises, abandoned his intention of removing, and resided with the vendee, but never assumed any dominion or control over the property sold, it was held that it did not constitute such a possession in the vendor from which a secret trust in his favor would be inferred, so as to make the transaction fraudulent by construction of law.

Appeal from a decree of the Circuit Court for Jackson County.

Wilson and Cleland filed their bill of complaint against Luke Lott in his own right and as Executor of Mary Thomas, deceased, alleging that Lott, in March 1839, conveyed to Mary Thomas his interest in certain lots in Marianna, and

38

also a tract of land situated in Jackson County ; that Lott being the owner of an interest in certain pre-emption claims likewise conveyed it to said Mary Thomas in her life time, and that at the date of these conveyances Lott transferred and conveyed to said Mary Thomas all his other property of every name, nature and description. The bill sets forth that at the time of these transfers and conveyances, Lott was largely indebted to many persons, and among them to complainants, who instituted separate suits against him and recovered judgments in March 1840, in each case for $4,434 39 ; that the executions which issued thereon were, in consequence of the transfers and conveyances which had been made, returned " nulla bona." It charges that the said transfers and conveyances were concocted and contrived in fraud, covin, collusion and guile, to the end and purpose, and with the intent and design to elude and deceive, hinder, circumvent, delay and defraud the creditors of said Lott in general, and especially complainants. That a merely nominal and fictitious consideration, if any, was given or known in these transactions, and that if any money passed it was borrowed for the purpose and immediately returned to the lender, and that if notes were given they have never been enforced, and were given as a pretence to cover the real nature of the transactions.

The bill further charges that Mary Thomas was in no sort of condition, either by age, ability, habit or inclination, to enter into such an extensive engagement, being an aged widow, having neither the time, capacity or disposition for such investments. That she never occupied or improved the town lots, and never cleared, planted or improved the land, but that said Lott had been in the receipt and enjoyment of the profits and income of all ; that Lott was the son-in-law of Mrs. Thomas, at whose house he and his family resided without any apparent and real difference or

exclusiveness of interest, and that she became the bailee of all his property for its protection, and to cover it from his creditors. It alleges, further, that before her death Mary Thomas made her will, by which she devised and bequeathed to her grand-children, to wit, the children of said Lott, all her property, reserving a life estate to her daughter, the wife of said Lott, and appointing said Lott Executor thereof. The bill concludes by praying that the transfers and conveyances referred to be set aside as fraudulent and void as to creditors, and that it be decreed that said Mary Thomas in her life time, was a trustee of the creditors of said Lott, and that said property be held to be subject to their debts and sold to pay the claims of complainants.

Defendant in his answer, states that in the latter period of the year 1838, or early in 1839, he proposed to emigrate to Texas, and that preparatory to this movement he sold all his property, both real and personal, except notes and accounts, to the said Mary Thomas. He declares that his intended movement to Texas was the only inducement with him to sell his property, and in the most pointed and unequivocal terms denies the truth of the allegation in the bill, of an intention on his part to defraud his creditors. He denies that there was any fraud, actual or constructive, in the sale of his property, and asserts that the transfer and conveyance thereof was for a full and valuable consideration, and proceeds to state in detail the valuations placed on the different parts of the property sold; that as soon as the conveyances were completed, the property was delivered to Mrs. Thomas, and she continued to possess and enjoy and control every part of it until her death.

The answer further states that the consideration for which defendant sold the property was paid in the following manner, viz: Mary Thomas paid the defendant one thousand

dollars in cash, one thousand dollars in his own notes which he had given her some time previous for a negro man, and two mules—assumed the payment of his stock note due the Union Bank for $1,333 33, and for the balance she gave him two notes which she paid before her death. The money paid defendant, he states he applied in various ways to his own use, but the great part of it he believes he lost at bragg. Defendant admitted that from the time of the said sale to Mary Thomas he and his family resided with her, but for reasons which he circumstantially states. He alleges that at the time he sold his interest in the pre-emption claims (eight in number) he entered into an obligation by which he bound himself in the penal sum of two thousand dollars that the entries of all said pre-emption claims should be effected ; that entries could be made of only four of said claims, for the reason that assignments of the other four could not be obtained from the persons entitled to them. That he was also bound by his said obligation to remain with and overseer for the said Mary Thomas until the price of the four pre-emption claims of which entries could not be effected, being $1200 00, should be satisfied by his personal services or those of a person to be hired by him to supply his place, and in compliance with this undertaking he remained with her. That when the time arrived when he was at liberty to leave without violating his engagement, his mother-in-law, Mrs. Thomas, begged him to remain with her until she could settle her affairs, promising, if he would, to accompany him to Texas. That while engaged in settling her affairs the infirmities of age were daily drawing her nearer to the grave, and defendant in consideration of her situation, added to her entreaties, and a promise of a liberal provision by her will for his children, consented to remain with her until her death. The answer further denies that he enjoyed in any way or shared

with Mrs. Thomas, the rents and profits of any part of the property, and that if he intermeddled with the property originally hers or that which she acquired by purchase from him, it was as her agent and overseer.

Allen H. Bush, a witness for complainant, testified that Mary Thomas resided at the place now occupied by Luke Lott from the year 1836 or 1837, to the period of her death which took place in 1847 or 1848. Luke Lott resided at the same place from the same period to the present time, except for a short time in the year 1837 or 1838, when he resided in Marianna. Mrs. Thomas was the mother-in-law of Lott and appeared to be on good terms with him; their personal relations were of the most friendly and confidential kind, and their associations were free and unreserved. That during the years 1836-7-8-9, and 1840, Lott was not a man of much wealth. Witness thinks he was not free from debt, but that he was in embarrassed circumstances, considerably in debt for a greater part if not the whole of the time alluded to. Thinks Mrs. Thomas in 1838 was not wealthy, but was in comfortable circumstances—cannot say in what her property consisted, and cannot say whether her fortune or circumstances were such as to induce her to enter into speculations. The common reputation seemed to be against the fairness of the contracts between Lott and Mrs. Thomas.

Thomas M. White, a witness for complainants, testified that in 1839 Mrs. Thomas lived in the town of Marianna in the family of her son-in-law, Luke Lott—does not know what her occupation was at that time, nor can he say whether or not she was knowing to the indebtedness of Lott. Witness thinks Lott was largely indebted from general reputation.

Michael Lott, a witness for complainants, testified that a most perfect understanding of friendship, respect, good

feeling and confidence existed between Mrs. Thomas and Lott, and that there was a great deal of intimacy, confidence and unreserved communication between them, but he could not state whether she knew or was informed of the engagements, bargains and contracts of said Lott, or whether she was apprised of his general or special indebtedness in the years 1837 and 1838, or of his indebtedness to complainants.

Mrs. Sarah Hudson, a witness for defendant, who was a near neighbor of Mrs. Thomas, and intimate with her and Lott, states that she never knew Lott to make use of the property as his own after the sale, or to receive or enjoy the products of the farm or wages of the negroes, or sell any of the personal or real estate until after the death of Mrs. Thomas. She further testifies that she thought it was generally known as she heard both Lott and Mrs. Thomas say it, that Lott sold his property with the view of removing to Texas, and that he was to wait until he could ascertain whether all the pre-emption claims could be perfected, and that finally he was prevailed on by Mrs. Thomas to stay and attend to her business for her. She further testifies that Lott was a favorite son-in-law of Mrs. Thomas, and they were always on good terms—that she always saw Mrs. Thomas exercising control over the property, and that if Lott sold any thing she was told by Mrs. Thomas that he always made a strict settlement with her.

John F. O. Thomas testified that he was living near Ochesee at the time of the sale to Mrs. Thomas—that she took possession of the property immediately after the sale, and managed and possessed it for her exclusive benefit, and for her sole right—that Lott, after the sale, never made use of the property as his own, or received or enjoyed the products of the farm, &c., and that if he ever had any thing to do with the property it was as overseer or

agent until he, witness, moved to the place, when he, witness, became manager and overseer of the negroes of Mrs. Thomas for about five years. He states that Mrs. Thomas and Lott were very friendly, and that she always placed a great deal of confidence in him, but he does not think that she ever knew any thing of Lott's indebtedness. That after the sale Lott lived in one end of a double penned house and Mrs. Thomas in the other, but that Mrs. Thomas managed and controlled the property to suit herself—that he acted as overseer for five years and every thing was carried on by her directions. That Lott never assumed any control after the sale, and that when he sold any thing it was by the directions of Mrs. Thomas, and he accounted to her for every thing.

Mrs. Susan C. Carraway testified that she lived with Mrs. Thomas at the time of the purchase by her of Lott's property, and that Mrs. Thomas moved to the place she purchased immediately after and managed and controlled and possessed the property for her own exclusive benefit, and in her sole right. That Lott assumed no control of the property after the sale, or use or sell any portion of it as his own, and that when he had any thing to do with it, he acted either as overseer or agent of Mrs. Thomas. She further states that it was generally known that Lott sold his property to Mrs. Thomas for the purpose of removing to Texas; that after the bargain was made Mrs. Thomas sent one of her sons to her house on Stafford Creek (where she resided) for her small trunk which contained her money; that witness saw the money some time before the sale and saw it counted to pay to Lott, but she does not know how much there was. Lott, she says, sold most of the crops, but as soon as he returned he gave Mrs. Thomas an account of the sales and settled with her.

John G. Gamble testified that Lott was the owner of

312 SUPREME COURT,

Wilson & Cleland vs. Luke Lott.—Statement of Case.

twenty shares of stock in the Union Bank of Florida, and that on the 27th June, 1839, he transferred the same to Mary Thomas. That the Bank held Lott's stock note dated 28th December, 1838, for $1,333 33, and that upon the transfer of the shares aforesaid the stock note of Mary Thomas was substituted for that of said Lott.

Joseph Thomas testified that he witnessed the execution of the deeds from Lott to Mrs. Thomas, and that they were fair conveyances, intended to convey absolutely all Lott's interest in the property named, and for the consideration therein expressed ; that the transaction was a fair and honest one, and founded on a valuable consideration and that Mary Thomas took possession of the slaves and other property immediately after the sale. He further states that Lott had given his note to Mrs. Thomas for $1000 for a negro boy and two mules, and that Lott took this note as that much cash in payment for the property sold Mrs. Thomas.

To discredit the testimony of John F. O. Thomas and Joseph Thomas, complainants procured the testimony of Robert L. Harrison, who testified that he was acquainted with both of them, and that their general character or reputation for truth and veracity, was bad in the neighborhood in which they resided in Gadsden County, and that he had no reason to believe it otherwise at the time he testified. That from his knowledge of this general character of John F. O. Thomas and Joseph Thomas, he could not believe either of them under oath in a cause in which they were under the influence of their interest or their affections.

*A. L. Woodward* for appellants.

1. Fraud is a question of *intent*, arising upon evidence. It may be imputed, ascertained and established by inference and deduction ; and it may also arise upon admission

or proof of certain facts, as *a presumption of law*, not to be rebutted or repelled.

II. The vendee's sanction or concurrence in the vendor's intent to hinder, delay and defraud creditors, vitiates any agreement or contract, and renders it void as to their claims.

III. The unconditional and absolute sale of a man's *entire estate*, he being largely indebted in proportion, or in amount equal to its full worth or value, his debts remaining wholly or the greater part unpaid, and the greater portion if not all the purchase price having been retained, reserved and appropriated, applied and expended otherwise—such a transaction, with all its surrounding circumstances, creates the presumption of a *fraudulent intent*, which, unless rebutted and satisfactorily explained, becomes *conclusive*.

IV. A secret trust or reservation for the benefit of the vendor or his family, to the exclusion of all or of any of his creditors, renders an agreement or bargain and sale void in *toto*, or so far as their rights may be affected thereby.

V. The participancy, sanction or concurrence of the vendee, in the intent, purpose, or design of the vendor, to hinder, delay or defraud creditors, may be presumed or inferred from the position, character, connection and circumstances, age, habits and pursuits or occupation of the respective parties to an agreement or bargain and sale, and such a presumption being raised, it becomes *conclusive* unless repelled and countervailed.

VI. A sale to pay a *pre-existing debt*, and the continuance of the vendor in possession, authorizes a legal presumption of an agreement or stipulation for the benefit of the vendor, not to be repelled or rebutted by evidence, and is fraudulent *per se*, and therefore null and void.

VII. The weight of evidence and the force of authority

39

are in favor of appellants.—And cited 2 Kent. Com., 515 to 31–32; 1 Story's Eq. Jur., 215, § 190, 297, § 369; 1 American Leading Cases, 55–56; Gressley's Equity Ev., 473–489. How vs. Ward, 4 Greenleaf, 195, 207; Halbert vs. Grant, 4 B. Monroe, 584; Poague vs. Boyce, 6 J. J. Mar., 70; Harrison vs. Campbell, 6 Dana, 264; Stephen's Adm'r. vs. Barnett, 7 Dana, 257; Herren vs. Morford, 9 Dana, 450; Kendall vs. Hughes, 7 B. Monroe, 368; Brown vs. Force, ib., 357; Brown vs. Smith, ib., 361; Walker vs. Cralle, 8 B. Monroe, 11; Borland vs. Walker, 7 Ala., 269; Borland vs. Mayo, 8 Ala., 104; Farmer's Bank of Virginia vs. Douglass, 11 S. & M., 469; How vs. Camp, Walker's Ch. Rep., 427; Sands vs. Codwise, 4 Johns. Rep., 537; Miller vs. Tollison, Harper's Eq. Rep., 145; Brown vs. McDonald, 1 Hill's Ch., 297, 303; Maples vs. Maples, Rice's Equity, 300, 310; Hansford vs. Archer, 4 Hill, 270; Browning vs. Hart, 6 Barbour S. C. R., 91; Gibson vs. Love, 4 Florida Rep., 217; Barrow vs. Bailey, Fla. Rep., 1853, p. 19.

*Hawkins* and *Campbell* for appellees.

WRIGHT, C. J.:

In this case the bill charges in substance, that on the 13th March, 1839, the defendant Lott conveyed to Mary Thomas certain property in the town of Marianna, and a tract of land in Jackson County—that Lott was the owner of certain lands obtained by pre-emption, which he also conveyed to Mrs. Thomas—that about the same time Lott also conveyed to Mrs. Thomas all his property, of every description—that Lott was then largely indebted to many persons in the County, and particularly to the complainants—that in March, 1840, judgments were obtained at law by complainants, and executions were issued against Lott and returned " nulla bona"—that the sale to Mrs.

Thomas was fraudulent as to creditors—that a merely nominal and fictitious consideration was paid, if any—that Mrs. Thomas was in no sort of condition to purchase, was an aged widow—that defendant Lott remained in possession of the property—that Mrs. Thomas lived with Lott, who was her son-in-law—that no separate account was kept of their affairs, and that shortly before the death of Mrs. Thomas, she made a will, devising all her estate to her daughter, Lott's wife, and appointed Lott her executor.

The prayer of the bill is, that the conveyance from Lott to Mary Thomas be set aside as being fraudulent, and that he be required to account as executor, &c.

The answer of the defendant, Lott, states, that in 1838 or '39, he had it in view to go to Texas, and with that intent sold all of his property, real and personal, except notes and accounts, to Mary Thomas—that he had no intention thereby to defraud his creditors—that the property sold went over into the possession of the vendee, who continued in possession until her death—that she paid him the purchase money as agreed on, partly in money, partly in his own notes, and that he lived with his mother-in-law after the sale, and attended to her business as an agent or overseer. He denies all fraud and secret trust—in short denies all the facts set forth in the bill as a ground for the interference of a Court of Equity.

A Supplemental bill was afterwards filed, charging Mrs. Thomas with knowledge of, and participation in, the fraud of the defendant, Lott. To this Lott answers in effect, that he does not believe that Mrs. Thomas knew of his indebtedness at or before the sale to her.

The testimony of a number of witnesses was taken in the cause, but it is sufficient to say that there is nothing in this to cast suspicion even, upon the truth of Lott's answers. The complainants are therefore in this attitude—

they have appealed to the conscience of Lott in relation to the facts on which they rely—he denies the facts charged, and they present no proof to contradict his answers.

It is true, as contended for on the part of the complainants, that fraud is in general, a question of intent, and may be presumed from circumstances, and in some cases the presumption is so strong as to be incapable of being repelled by proof, but in the case before us, the facts disclosed, to-wit, that Lott was largely indebted, that he made the conveyance in question to his mother-in-law, and that he conveyed his entire property, though these may be badges of fraud, yet to say that they constitute fraud in themselves, would be to carry the doctrine beyond the limits of reason or authority, and to shut out the light of wisdom and truth. Here by the evidence brought out by the complainants themselves, we have all these facts explained—all these badges of fraud removed, at least so far as Mrs. Thomas is concerned; for she, it seems, knew nothing of Lott's indebtedness, or of his fraudulent intent, if it existed. She paid for the property purchased, what seems a full and adequate price.

From this state of the case, it follows that Mrs. Thomas must be deemed a *bona fide* purchaser, for a valuable consideration, without notice even of Lott's indebtedness.

Let the decree of the Court below be affirmed.

THOMPSON, J.:

I concur in the judgment of affirmance of the decree rendered in this cause in the Court below.

The question raised in this case is simply one of fact—whether the parties to the conveyance complained of were guilty of an actual fraud; or, whether those facts and circumstances existed, and attended the transaction, which work the same mischief, and which in contemplation of

law are deemed badges of fraud, or presumptions of ill faith, and from which the law, upon principles of public policy, deduces a fraudulent intent, and declares the contract void as to creditors—in other words, whether the transaction is tainted by fraud in fact, or fraud by construction of law.

It was remarked by Ld. Ch. Elden, in the case of Mortlock vs. Buller, (10 Ves. R., 306,) that the Court has never ventured to lay down, as a general proposition, what shall constitute fraud ; nor does it seem possible that any fixed and invariable rule can be established on this point, which would not be liable to be circumvented, and utterly defeated by new schemes, which the fertility of man's inventive genius would contrive. The question of fraud is one of *motive and intent*, and can rarely, if ever, be considered as a single fact, but a conclusion to be inferred from all the circumstances of the case. In the proof, however, the same general rule prevails in equity, as at law ; it is not to be presumed, but must be proved.

The counsel for the appellants has argued this case upon the assumption, that in a Court of Equity, fraud may be presumed, and that in this a diversity exists between such tribunal and a Court of law. In this, the counsel has laid down the position too broadly. I am aware that fraud is always secret ; that where persons design to commit it, they do not publish their motives and intentions, for this would be to defeat the end they aim at ; and I am also fully aware how difficult it is to demonstrate the intention from the overt acts and conduct of the parties ; yet these difficulties furnish no reason for the assertion of the power, by a Judge, guided by no more certain rule than his own arbitrary conclusions, to presume a fraudulent intent from what has been called the moral evidence, but which, however, may more correctly be termed his own vague sus-

picions of the nature and character of the transaction, unassisted and uncontrolled by any certain and fixed principles. In such case, every transaction would be dependent on the peculiar notions of the Judge, as to what would constitute good or ill faith. The fairest transaction, in the view of a suspicious mind, might be deemed fraudulent, while to another mind of an opposite cast, a course of conduct justly obnoxious to censure, would escape with impunity.

When it is said that fraud may be presumed in a Court of equity, when the same presumptions will not be entertained in a Court of law, it is to be understood, that in some peculiar and particular cases there exist exceptions to the general rule before laid down. The subjects of these exceptions will be found in those two species of fraud which are mentioned in the classification of Ld. Ch. Hardwicke in the case of Chesterfield vs. Jansen, (2 Ves. R., 155,) as the second and third kinds of fraud. The learned Chancellor thus classifies the different kinds of fraud :

"First, then, fraud, which is *dolus malus*, may be ac-
" tual, arising from facts and circumstances of imposition,
" which is the plainest case.

" Secondly, it may be apparent from the intrinsic nature
" and subject of the bargain *itself*, such as no man in his
" senses, and not under delusion, would make on the one
" hand, and as no honest and fair man accept on the other,
" which are unequitable and unconscientious bargains.

"3. A third kind of fraud is that which may be presu-
" med from the circumstances and condition of the parties
" contracting ; and this goes further than the rule of law,
" which is, that it must be proved, not presumed. But it
" is wisely established in this Court to prevent taking sur-
" reptitious advantage of the weakness or necessity of an-
" other, which, knowingly to do, is equally against con-

" science as to take advantage of his ignorance ; a person " is equally unable to judge for himself in one as in the " other.

" 4. A fourth kind of fraud may be collected or inferred, " in the consideration of this Court, from the nature and " circumstances of the transaction as being an imposition " and deceit upon the other persons not parties to the frau- " dulent agreement.

" 5. The last head of fraud on which there has been re- " lief, is that which infects catching bargains with heirs, " reversioners or expectants, in the life of the father, &c., " against which relief always extends. These have been " generally mixed cases, compounded of all, or several spe- " cies of fraud, there being sometimes proof of actual fraud, " which is decisive."

It will be apparent, from this quotation, that the presumptions arising from the intention, or moral evidence, as it has been termed, are alone applicable to those cases which arise under the second and third divisions, and to those under the fifth, which partake of the nature of the two former ; in all other cases, the general rule must prevail. And even in the excepted cases referred to, Courts of equity are as little warranted as Courts of law in imputing or presuming fraud, upon the mere arbitrary notions of the Judge, but under each head certain bounds and limits have been established, within which the discretion of the Judge is to be exercised, and which are already as widely extended as is consistent with a due regard to the inviolability of the right to contract. It seems hardly necessary to add that this case does not come within any of the exceptions, but is to be determined by the application of the general rule ; and those marks, badges or presumptions of fraud, which are inferred by law, are, and must be,

deduced from facts, which it allows to be rebutted by evidence.

The facts and circumstances of this case, as drawn from the evidence, may be succinctly stated as follows :

It appears that in March, 1839, the respondent, Luke Lott, being then and before that time, largely indebted to the appellants and others, (although it does not appear that he was actually insolvent,) and having determined to remove to the Republic of Texas, made a sale of all his property, real and personal, to Mrs. Mary Thomas, his mother-in-law, for the sum of $9,600, which said sum appears to have been the full value of the property conveyed, and was paid partly in cash upon the execution of the conveyance, partly in the promissory notes of the vendor, and for the residue the vendee, Mrs. Thomas, gave her own notes, which were subsequently paid. That immediately upon the sale and conveyance before mentioned, Mrs. Thomas took possession of the property conveyed, removing her slaves and other property, to the farm purchased of Lott, and exercised dominion and control over the same as owner, and for her sole and exclusive use and benefit, until the period of her death, which occurred in 1846. It further appears, that a part of the property sold consisted of eight pre-emption claims, and that it was stipulated in relation to these by a separate agreement, that if it should happen that any of these claims should not be located and entered, then the vendor, Lott, should indemnify the vendee to the value thereof in serving her as an overseer, or to employ one for her at his expense ; that entries of some of these claims were not effected, and that Lott, in conformity with his agreement, reimbursed Mrs. Thomas by services in the capacity of overseer, but the precise times when this service commenced and when it terminated are not stated ; it is stated in Lott's answer, that he was so employed for

several years ; and that afterwards he was induced to a-
bandon his design of removing to Texas, by the entreaties
of his mother-in-law, and by her promise to provide liber-
ally for his children in her will, which, as it further ap-
pears she did, by devising and bequeathing to them her
entire estate.

The evidence is full that Mrs. Thomas was most tender-
ly attached to her daughter, Mrs. Lott, and also to her son-
in-law, the defendant Lott, and that she always opposed
most earnestly the removal to Texas, especially as she con-
sidered herself too far advanced in life to accompany them.

The appellants became judgment creditors in 1841, and
filed their bill seeking to set aside the conveyance on the
ground of fraud, in 1847, after the death of Mrs. Thomas,
The counsel for appellants, besides the argument before re-
ferred to, following the allegations of the bill of complaint,
contended for an inference of fraud deducible from the fol-
lowing circumstances :—1. The relationship by affinity be-
tween the vendor and Mrs. Thomas, the vendee ; 2. The
large indebtedness of Lott to complainants and others at
the time of the sale ; 3. The actual or presumed knowledge
of Mrs. Thomas of the fact of such indebtedness, and of
a design to assist Lott in a fraud upon his creditors ; 4.
That the sale was not made upon a good and valuable con-
sideration ; and 5. That possession did not accompany and
follow the conveyance, but continued in the vendor.

The fact of the relationship between the parties is not
*per se* a badge or mark of fraud. I am not aware of any
principle of equity which regards a sale and conveyance
by one relative to another, standing alone, as a circum-
stance of suspicion.   Combined with other circumstances,
it may serve to elucidate, explain, or give color to a trans-
action, such as a sale at a considerable under value, &c.,
&c.   (Copes vs. Middleton, 2 Madd. R., 409,)   If it is
40

combined with the ground subsequently alleged, of the large indebtedness of the vendor, it is still not of any importance; nor do the facts taken in connection amount to a badge or mark of fraud. And even if the two preceding facts be combined with the allegation of an actual knowledge, on the part of Mrs. Thomas, of the indebtedness and embarrassment of Luke Lott, (assuming such allegation to have been maintained by proof,) it will not make out a case of fraud. In Barrow vs. Bailey, (5 Florida R. 25,) this Court held " That one in failing circumstances, or " even insolvent, has a right to sell or assign his property, " except as against pre-existing liens, for the purpose of " paying his debts; and if he has the right to sell, of course " any one has the corresponding right to purchase. The " only limitation upon the exercise of these rights is, that " the sale and purchase be in good faith and for a valuable " consideration. If the appellant's purchase falls within " this rule—if he purchased from the vendor in good faith " and for a 'fair price—it is perfectly immaterial whether " said vendor was embarrassed, or insolvent, or other- " wise, or whether the condition of his affairs was or was " not known to the vendee."

But there is no evidence of any knowledge on the part of Mrs. Thomas of the condition of her son-in-law's pecuniary affairs; and if Lott entertained within · his own heart any design to defraud his creditors, there is no proof in the record before us that Mrs. Thomas knew of it, much less participated with him in carrying it into execution. It was a fact to be proved by the complainants, and the respondents might well have relied on the maxim, *idem est non esse et non apparare;* but there is affirmative proof, tending to negative the fact of knowledge of Lott's indebtedness—there is proof that at some period subsequent to the sale, she reproached Lott for having kept the circum-

stance of his indebtedness concealed from her. It is supposed by the counsel for complainants that a presumption of knowledge arises from the relationship between Mrs. Thomas and Lott, and he cites the case of Barrow vs. Bailey as authority for such position. But there is a misapprehension of the decision of the Court. In the case cited, there was an admission in the answer of Barrow as to a correspondence between himself and his brother-in-law in relation to the pecuniary embarrassment of the latter, the substance of which correspondence was claimed to have been set forth in the answer, but the letters themselves were not produced in evidence, as they should have been, and the Court, in the absence of the letters, assumed that Doggett had been as full and unreserved in his communitions with his brother-in-law as he had been to the witnesses, who were strangers, and especially as Mr. Barrow had, during the correspondence, required full and particular information as to his correspondent's pecuniary condition, and what he expected and hoped for. See 5 Florida R., 22, 23.

As to the fourth ground taken, that is fully and flatly contradicted by the evidence in the record. There is no evidence that the property sold and conveyed was rated at an under value, and the proof is full that the consideration agreed upon was fully paid. That the money paid did not reach the hands of Lott's creditors, in discharge of their respective claims, but was in fact lost at the gaming table, was no fault of Mrs. Thomas, and the consequence thereof, or the punishment therefor, should not be visited or inflicted upon her or her divisees and legatees, the children of Luke Lott.

It is next assumed that the transaction is fraudulent because possession did not accompany and follow the deed, but remained unchanged in Luke Lott. Is this true in

point of fact? The answer of Lott is in strict response to the bill in this particular, and not only stands uncontradicted, but is supported by the testimony of the other witnesses, John F. O. Thomas, Mrs. Hudson and Mrs. Carraway. He avers a delivery of possession by himself, and an acceptance by Mrs. Thomas, immediately upon the sale and conveyance, and that Mrs. Thomas removed her other personal property to the farm purchased from Lott, and continued to occupy and possess it, and all the property thereon and attached thereto, exercising full and complete dominion over all for herself as owner.

It is, however, supposed that the evidence establishes a possession by Lott in common with Mrs. Thomas, continued from the time of sale; but I do not concur with the the counsel in this view. Lott having sold off all his property, with the design of going to Texas, it was most natural and reasonable that he should be the guest of his wife's mother until his affairs were so arranged as to enable him fo execute his intention. The testimony negatives positively any control over or interference with the property by him until his term of service commenced as her overseer, and then also the evidence is clear that he never exceeded the usual control of an overseer, but always preserved that character, conforming to the directions and orders of Mrs. Thomas.

When this term of service commenced as overseer, I have before remarked, does not appear; but it was to commence, according to the agreement for the sale of the pre-emption claims, so soon as it was ascertained that the contingency happened of a failure to effect entries of said claims in the land office, or of some of them. From the very nature of the case, some time must necessarily elapse before this could be ascertained, whether he should either serve as overseer, or provide her one, if he did not wish to

be detained in the prosecution of his purpose to remove to Texas; and hence it was to be performed at some future time. It does not appear at whose instance this stipulation was inserted in the agreement, but I think the conjecture suggested at the bar, that it was insisted upon by Mrs. Thomas, with a view to retard and put obstacles in the way of, if not wholly thwart, Lott's removal, with his wife and children, a very reasonable and probable presumption. There was no continuance in possession by Lott in the capacity of owner and proprietor, but the change was so open and notorious to the neighbors that it seems to have been observed by all. There was no agreement that Lott was to have any use and benefit from the property as lessee or hirer; no agreement that he should continue in the possession; no *devisum imperium*; no united or common possession; in fact, no such continuation of possession from which a secret trust or reservation in favor of the vendor can be inferred.

In the case of Gibson vs. Love, decided in this Court, (4 Florida R., 217,) cited at the bar, a slave had been sold in discharge of a precedent debt due from the vendor to the vendee, but it was stipulated and agreed that the slave should continue in the possession of the vendor, as before the sale, and for his ease and convenience, he promising to pay the vendee a hire equal to the legal rate of interest on the price agreed upon. The Court properly held that the continuation of possession by the vendor was not sufficiently explained by the evidence to repel the inference of fraud which, in contemplation of law, was deducible therefrom; that the appropriate evidence to rebut the presumption, is an explantion of the intention, to show either that it is consistent with the deed, or is unavoidable, &c. The want of analogy between the case cited and the case at bar, is ob-

vious. Here there is no retention of possession by the vendor, either alone or jointly with his vendee.

With respect to the allegation in the appellant's bill of complaint, of the pecuniary inability of Mrs. Thomas to make the purchase of Lott, it will be sufficient to say that the effort to sustain it by proof was very feeble. One witness only was examined upon the point, and his statement is very vague and indefinite. He says she was not wealthy, but was in comfortable circumstances. The sequel, however, sustains her ability. It is proved that she paid for the property in full, and this is amply sufficient to negtive the allegation of the bill.

Upon the whole case, I am perfectly satisfied that the appellants, who were complainants in the Court below, have utterly failed to make out a case for relief, and that the Court below committed no error in the rendition of the decree dismissing the bill of complaint.

SEMMES, J., in assenting to the judgment of the Court, was understood to adopt the reasons contained in the Opinion delivered by Justice Thompson.

*Per totam curiam.* Judgment affirmed with costs.