L. M. BALLARD ET AL., APPELLANTS, VS. ECKMAN & VETS-
BURG ET AL., APPELLEES.

1. An oath to a bill for injunction by a solicitor, "that the facts set forth in the foregoing bill are true to the best of his knowledge, information and belief," is not sufficient to authorize an injunction. It states no facts, nor that affiant has any knowledge, information or belief whatever.

2. Where facts are stated on information the officer to whom application is made for an injunction should require the additional affidavit of the person from whom the information is derived, verifying the truth of the information.

3. An irregular or improvident order granting a preliminary injunction, however erroneous, will not affect a final decree granted after a full hearing upon the pleadings and testimony.

4. The question of fraud is one of motive and intent to be inferred from all the facts and circumstances attending a transaction, and does not depend upon presumptions not legitimately drawn from the fact.

5. When a purchase of goods is made in good faith and for a valuable consideration, from the owner who is embarrassed and insolvent, no fraud is imputed to the purchaser.

Appeal from the Circuit Court for Polk county.

This is a creditor's bill filed by respondents against appellants. Respondents obtained judgments amounting to $2,296.85, against Louis M. Ballard, in assumpsit; executions were issued and returned *nulla bona.* The bill alleges that L. M. Ballard has made a fraudulent sale and delivery of his stock of merchandise to H. D. Ballard, to defraud the creditors of Louis M., and to evade the payment of his just debts. A decree is prayed setting aside the sale and transfer, and declaring the stock of goods subject to the judgments and executions aforesaid, and for an injunction restraining defendants from interfering with or disposing of the goods.

The bill was sworn to by counsel for complainants, who says: "That the facts set forth in the foregoing bill are true, to the best of his knowledge, information and belief." On filing the bill, an order for injunction was granted, and it was ordered that the complainants enter into bond in the sum of two thousand dollars, conditioned to indemnify the defendants for the wrongful suing out of the injunction. It was further ordered that ——— ———, of Polk county, be appointed receiver, to take charge of, sell, and otherwise dispose of said stock of goods, and that the receiver hold the moneys arising from the sale subject to the order of the court. The record does not show that a receiver was named.

The sheriff made return as follows: "Service rendered by closing the store-house of L. M. & H. D. Ballard, the 17th July, 1882, and also taking an inventory of all the goods and appurtenances in said store-house."

The answer of L. M. Ballard admits the recovery of the judgments, the issuing of executions and the return of *nulla bona*. That prior to February 8, 1882, he was engaged in mercantile business with one A. J. English as a partner, each owning one-half interest in the stock of goods. That in behalf of H. D. Ballard he bought the interest of English for about four hundred dollars, and on February 8, 1882, sold to H. D. Ballard the entire stock for seven hundred and fifty dollars, including some other property, the goods being valued at $700, which $750 has been paid by H. D. Ballard, by payment of the largest part to defendant's creditors, and in family supplies to himself for the residue. And he says that the sale of his said interest in the goods was made in good faith and without design to defraud his creditors or any of them. That he has no property out of which he can satisfy his debts. That ever since the 8th February, 1882, H. D. Ballard has had pos-

session of the store and goods as his own property, and this defendant has no interest therein whatever. That whatever interest he had in the store of goods prior to the sale to H. D. Ballard, was by law exempt from levy and sale on said executions.

The answer of H. D. Ballard denies any fraud in the purchase by himself of the goods, but avers that it was made in good faith and for a valuable and full consideration. He says that he first bought, through his brother, L. M. Ballard, the interest of English in the stock of goods, and then purchased the interest of L. M. Ballard, and on the 8th day of February, 1882, took charge of the stock, and was in charge of what remained of it at the filing of the bill. He claimed and sold the stock as his own, having bought and paid for it. He had been engaged in merchandising at Bartow with one Bevill, and the firm had a stock on hand February 1, 1882, of $1,138, and goods in transit, $683.36, making a total of $1,821.38. He purchased Bevill's interest in those goods and brought them to Medulla, and those, with the goods bought of English and L. M. Ballard, in the store, made a total of $2,571.38, only $350 of which had belonged to L. M. prior to his purchase of them. He has since purchased goods of merchants to the amount of $1,240.84, making altogether the sum of $3,812.-18. He had paid for the goods bought of L. M. Ballard and English, of which $376 was paid down in trade, a note was given for $250 and the balance was traded out in the store by L. M., and previous to the filing of the bill he had paid him in goods out of the store the sum of $244, thus overpaying the amount by $120. That he had every reason to believe that the sale made by L. M. was made in good faith, for when he was bargaining for the stock L. M. told him he had sold some land that would clear up his liabilities, and respondent believed it was so, and still be-

lieves it would have been so but for the course of the complainants.

Complainants filed a general replication, and on November 9, 1882, on motion of defendants, the injunction was dissolved, and the goods ordered to be restored by the sheriff to the defendants, on the ground that complainants had not given a bond as required by the original order. On November 10, complainants' solicitors filed a bond and also a petition stating that they "having reason to fear, and do fear said stock of goods will sold or otherwise disposed of before the final hearing and disposition of said cause," they pray an injunction forbidding the sale or other disposition of the stock of goods until the further order of the court. This petition was not sworn to. The injunction was granted. November 11th, defendants moved to dissolve the injunction on the ground that the petition was not sworn to. The motion was denied.

Testimony was taken before a referee, and on December 12, 1882, a final decree was made, "that the sale by Louis M. Ballard, of the stock of goods in question, was made without consideration and for the purpose of defrauding the creditors of the said Louis M. Ballard, and it further appearing to the satisfaction of the court that any interest in the said stock of goods which may have been owned by the said Hiram D. Ballard had been transferred by him to the said Louis, and that there is no doubt that the entire stock is subject to the judgment and executions of the complainants." It is therefore decreed that the sale by L. M. to H. D. Ballard be cancelled, and the stock of goods declared subject to the judgments and executions of complainants, and the temporary injunction made perpetual.

The following is an abstract of the material testimony contained in the record :

*Peter C. Hayes*, on the part of complainants, testified: He

had a conversation with H. D. Ballard about the 10th May, 1883, in which H. D. Ballard stated to him, and showed him a paper stating the trade by which L. M. Ballard had sold H. D. Ballard a saw mill ; that the latter had bought the mill from Louis M., and had paid him $550 in goods, and gave three notes of $250 each, to be paid in lumber. Louis M. Ballard occupied a store in which he carried on a general merchandise business from the early part of the year to June or July, when he was closed up by the sheriff. That paper bore date some time in March. By that paper Hiram D. Ballard agreed to give Louis M. Ballard $1,300 for the mill, oxen, shop and wagon, of which $550 was paid "in goods." Hiram told witness that he had no interest in the store that was afterwards closed up. This was about in June, three or four days before the store was closed up. Hiram D. Ballard told me that Louis M. Ballard was using his name in the store business on account of debts and judgments against Louis. Witness bought of Hiram D., an interest in the mill, and worked there ; was in the store nearly every day. Louis M. was in the store managing the business. Hiram D. kept books and sold lumber at the mill, and to the best of my knowledge had nothing to do with the store. The paper showing the sale of the mill by Louis M. to H. D. Rallard was witnessed by James Keen and H. N. Allen. A writing is shown witness which recites a sale of the mill, &c., by L. M. to H. D. Ballard for $1,300, of which " $550 has been paid," but says nothing of the payment " in goods," and witness says this is not the same paper, because the paper shown him by H. D. at the time he bought an interest in the mill read " five hundred and fifty dollars in goods."

*C. C. Gresham* testified : As sheriff, took possession of the store and stock of goods, which were inventoried at $2,125. H. D. Ballard had been engaged in keeping a bar-

room, and after closing that went in with Mr. Bevill in general merchandise. When he came to Bartow he was considered a poor man; understood from him that L. M. Ballard was a partner in the bar-room; the stock of liquors was generally of the value of $500, in his judgment. Ballard came here with an ordinary supply of household and kitchen furniture for a poor man; when witness went to levy the execution on the goods in the store, L. M. Ballard claimed the benefit of the exemption laws; and applied to have certain property exempted and set apart, and witness had property to the amount of $330 set apart as exempted, and not included in the inventory. He asked me if he would not be allowed to exempt enough out of the stock to make one thousand dollars. Have no personal knowledge of H. D. Ballard's affairs.

*A. J. English*, in behalf of complainants, testified: That he was in business with L. M. Ballard, in the mercantile business, from September, 1881, to February, 1882; had a half interest; the entire business was valued at about $2,500 when I commenced, and the assets were about $1,900 when it ended. These amounts included the store building and accounts. When I first went in the business was run in the name of L. M. Ballard & Co. About October or November it was changed and run in my name. The first time he spoke to me about the change he said he thought he would go into bankruptcy, and that we would run the business in my name; afterward changed his mind about going into bankruptcy. My connection began by my purchasing a half interest from L. M. Ballard, and ended by my selling out to L. M. Ballard. We took no inventory when the change was made, but stock was taken a few days before I went out. He said he was buying for H. D. Ballard, and he was going out of business. Understood the trade for my interest was for H. D. Ballard, and took a

mare from him in part partment. The bargain was made with L. M. ; took a mare and colt from him in part payment.

*N. A. Booth*, for complainants, testified : In April, 1882, I sold to H. D. Ballard a yoke of steers. I asked him if he could give me an order to the store for a few goods. As well as I remember he said he had given orders there to the amount of $70 or $75, and he didn't care to give any more, that he would have to pay the money and take up his account in the store. I refer to the Ballard store that was closed up. L. M. Ballard was then selling goods in the store.

*James T. Evers*, for complainants, testified that during the summer of 1882 he went with L. M. Ballard to Savannah to buy goods. On the way he made a proposition to me that we go on and he would buy a stock of goods and come back, and he would turn the proceeds over to me. At Savannah witness endorsed L. M. Ballard's notes to Eckman & Vetsburg and Solomon Brothers to the amount of six hundred dollars for goods bought, which he paid. About the time L. M. sold his place I advised him to settle up what he owed for goods, that I thought he had enough to settle up what he owed, and he said if he paid out all he had on his debts it would leave his family without anything, and he would be ruined, or something to that effect. This was in December, 1881, or January, 1882, and before payment of the notes I had endorsed. Afterwards L. M. Ballard wrote me a letter (which has been misplaced) in which he proposed to sell out to me his goods, store-house and some lands near Medulla. He did not put any valuation on the property. This letter was written after Hiram D. moved to Medulla. He did not say anything in it about anybody having an interest in the goods. It was after he and English had settled up their partnership business. I

replied that I did not do business that way. After I heard that L. M. Ballard's store was closed up by the sheriff I wrote him that he knew he was owing these debts, and that the goods were his, and for him to pay for them if he could, and fix the matter up and go on with his business. He replied. I don't know where his letter is. I cannot remember all that letter, but at the end he said: "Stand still and see the salvation of the Lord." He did not reply to my assertion that he owned these goods. Did not deny owning the goods. On cross-examination witness says : When Mr. Ballard proposed to me to buy goods, sell them and turn over the proceeds to me, I understood it as a reality, but he has since told me he meant it as a jest. I took his word that he would protect me as indorser at Savannah.

*T. J. McMullin*, for complainants, testified that when H. D. Ballard first went to Medulla he was engaged in selling goods in the store-house used by L. M. Ballard. He was next engaged in the saw-mill business. He claimed to have an interest in the store when he first went there to the extent of the goods he carried there he bought from Bevill & Co. I was wishing to go into business of that kind, and asked Hiram Ballard if he wished an assistant in the store, and he remarked that Louis Ballard was attending to that business, and he was altogether engaged in the mill. Before I got to see L. M. Ballard on the subject the young man, Gus. Hays, was employed in the store.

A writing was introduced, signed and sealed by L. M. Ballard, dated March 11, 1882, witnessed by H. N. Allen and James Keen, by which, in consideration of $1,300, of which "$550 has been paid, and the receipt hereof acknowledged," and the balance to be paid in lumber, in three installments, by the 25th December, by H. D. Ballard, L. M. Ballard sold and conveyed to H. D. B. one

steam saw-mill, saw-frame, two guns, one corn-mill and lumber cart, and all mill fixtures, blacksmith tools, two yoke of oxen and wagon.

On the part of defendants, *Frank L. Wilson* testified: When I got acquainted with H. D. Ballard he was bar-keeper, and I left. When I returned I found H. D. B. here in Bartow. Heard he had bought out Bevill, his partner in mercantile business, and moved to Medulla. I went there and got a job with him at saw-mill. He and others told me he was running a store there, and I bought goods from the store. When we settled he brought up what I was due for goods, and I my time. Know nothing about the ownership of the store except from hearsay. Know nothing of H. D. B. exercising acts of ownership over the store, only by selling goods to me and others, and they paying him for them, and he saying it was his. All the mill hands understood it was H. D. Ballard's, and he told us to go there and get goods when we wanted them, and that the reason he had a store there was because he could pay off his mill hands without paying money. Saw two wagon loads of goods hauled from Bartow to Medulla, for H. D. Ballard from Bevill. L. M. Ballard kept the post-office in a corner of the store, and have seen him selling goods. H. D. B. went back and forth from mill to store, and I thought he had supervision of everything.

*A. T. Mann*, a witness for defendant, testified that H. D. Ballard, when in Bartow, ran a bar-room, and afterwards he and Bevill and Smith bought and run a saw-mill. He went in with Bevill in the mercantile business after he quit the bar-room. He owned some other property, houses and land. After that he bought Bevill's part of the goods and carried them to Medulla—three or four wagon loads of dry goods and hardware. Witness states that he was a witness to the first contract between H. D. and L. M. Ballard in

March.   Heard the contract read, and looked over it.   The payment was to be made in lumber, $1,300, and the contract did not say anything about whether part of the payment had been made already.   Heard from Henry Allen and H. D. Ballard that they tore up that contract and made another in about a week.   After I witnessed this contract H. D. Ballard took charge of the mill.   I bought goods from H. D. B. in the store.

*F. F. Bevill*, in behalf of defendants, testified :  Was in the mercantile business with H. D. Ballard about a year, and was in the saw-mill business with him and Smith awhile.   He owned a half interest in a block in Bartow, and a house and lot.   We bought two and a half acres from Pearce and five from McKinney, and we entered 40 together.   I sold him my interest in the mercantile business when we dissolved, about February 1, 1882.   We had on hand in stock in the house $1,138.02, and goods bought and in transit other goods, swelling the amount to $1,821.-38.   H. D. B. assumed all the debts, and I turned over to him my interest in the stock of goods.   These were the terms of the sale.   There was about $200 in cash on hand that was divided.   The amount of liabilities he assumed was $2,374.   Some cotton had been shipped to some of the creditors in Savannah.   He sold the land.   H. D. Ballard has the reputation of an honest man.   Cross-examined : When he bought me out he said he was going to carry the goods to Medulla.   I saw a letter from Louis Ballard to him asking him to come up and buy out A. J. English, for he, L. M., could not.

*L. M. Ballard* testified: I did business on my account up to February last (1882).   From February to July, I was employed in the store by H. D. Ballard.   He (H. D.) owned the stock of goods, but the store-house was owned by myself.   I sold him the stock of goods on February 8, 1882,

and the mill about 1st March. English's interest in the goods was half the stock, the whole valued at $750, but I had to pay him $400 to get him out. Immediately after the purchase I transferred the whole of my interest to Hiram Ballard. He paid me two mares and a buggy. There was some other trade payment, but I don't now remember what it was. I took the mares and buggy at $400. There was a balance due me, which was placed to my credit in the store. I paid it out on the debts I owed to my neighbors, most of it. The $400 paid to English was paid partly by me and partly by Hiram out of store. The whole interest of English and myself in the stock was paid for by H. D. I never at any time bought any interest in that stock of goods from H. D. Ballard. I afterwards sold him a steam saw-mill, lumber cart, two guns, wagon, two yoke of oxen and blacksmith shop. There was a contract, called a bill of sale. I first sold him the mill, payable in lumber entirely, and then there was a writing drawn up, but a few days later we made a different trade, and the first writing was torn up and another made. He paid me a yoke of oxen, some town lots amounting to $550 ; there never was any other written contract in regard to the mill, only this paper and the one that was torn up ; there was not any trade made or papers drawn up concerning the sale of the mill expressing that payment should be made in goods for the mill, or that goods had been paid for the mill. After I was employed by H. D. Ballard I had the management of the store. I never had any title or claimed any ownership to it ; I never said or wrote to any body that I had any title or ownership ; I made remittances for H. D. to complainants on account of F. F. Bevill & Co. ; they never objected to application of the money so remitted on account of Bevill & Co. I heard part of Mr. Evers' testimony in regard to a conversation he says occurred on

the road to Savannah; Mr. Evers made the first proposition; he proposed that we put up a big store at Tampa, and break down the merchants there; my answer was, I doubted our ability; then I said I had better buy a big stock of goods and sell them out to you; that is all the conversation I ever had with him of that kind; we both laughed, and Evers said all right, and we drove off; I did not mean what I said in that proposition, nor do I believe that Evers meant it; I received a letter from Mr. Evers stating that the goods were mine, and to compromise this matter, and if I could not pay dollar for dollar, to pay what I could; I just answered him that I was not able to pay the matters; that it would leave my family in suffering condition; I did not deny or acknowledge the ownership of the goods in my answer, for I knew that he did not know anything about them. I did not acknowledge that the goods were mine, because I did not think it was any of his business. The goods were not mine. The amount exempted by the sheriff for me was all the personal property I had at that time. Since the closing of the bar-room business in Bartow, I have had no business interest with H. D. Ballard here; was not interested in the store of F. F. Bevill & Co., nor in the sawmill, nor in real estate, nor in personal property. I have applied the proceeds of all property sold, as far as I could do, for the comfort of my family and to the payment of debts. I have not retained for myself as much of either personal or real estate as the constitution and laws of this State allow. The amount exempted for me by the sheriff was all the personal property I had at the time. Don't know what the exemption laws allow in this State.

*H. D. Ballard* testified: That he is the brother of Louis M.; I own a store at Medulla; I carried part of the goods from this place (Bartow), bought from Mr. Bevill; I

bought part of the goods that were already there from Louis M., and part of the goods I have there I bought elsewhere, in New York, Savannah and other places; bought at Medulla about $750 from L. M. Ballard. It was owned by himself and Jack English; I talked with English about the trade, and we agreed, but as some misunderstanding arose as to the property to be given, I left L. M. Ballard to close up the trade for English's interest. English sold the stock of goods, land and other property altogether. Louis took the land and I took the goods. The trade was made with the understanding that the goods were for me and the land for Louis. I paid for the goods in full, with money and other property of my own; I continued to own that store up to the time it was closed by the sheriff; I managed it part of the time myself, and Louis part of the time; I employed him, and sent the clerk to him, and he employed him; I know of no fraud or intention of fraud, when the trade was made; I have never sold any interest in the store; have never sold any stock except in the ordinary course of trade; never sold any of it for a saw-mill; I carried to Medulla the stock of Bevill & Co., and goods bought for the company, in transit, of the value of eighteen hundred and twenty-eight dollars. A detailed statement is submitted. After I had got the two stocks together, the stock amounted to about $2,550, more or less, all of which belonged to me. I bought also other goods amounting to $1,240, before the store was closed; I had a conversation with Mr. Hays; we owned a saw-mill together, and when we shut down this conversation occurred; I I kept the books and paid the hands from the store; Mr. Hays and I had a settlement, and I had paid the hands, and the mill owed for it; Hays wanted to leave the matter over until we came back from Orange county; I told him I could not do it; that I was not interested in the

43

store; this was all the conversation; we had other money that belonged to the mill business of Hays & Ballard, and settled up the store account; I made that remark to him because I was urging him to a settlement, that is, the remark that I owned no interest in the store. I run the mill separate from the store, and kept an account against myself, and Mr. Hays also; Mr. Hays was behind with me, and I did not want him to get in any further. As to the conversation mentioned by Mr. Booth, I told him I did not want to pay any money on the oxen; that goods were the same as money; that I was buying his oxen for the mill company, and the mill company was behind with me about $75; I did not go into any further explanation with Mr. Booth. Witness then went into a detailed statement of his property when he went to Medulla and bought the store and mill, &c., from his brother, showing assets of about $1,125, besides his interest in the Bevill stock of goods; his store and mill business was "paying," and up to the time the store was closed up he had paid debts of F. F. Bevill & Co. to the amount of $1,541.44; when the store was closed there was about $2,200 in the store, according to the inventory; there is still unpaid of the indebtedness of Bevill & Co., payable out of that stock, $847.85. I do not owe Louis M. Ballard anything, and he does not owe me; our matters have been settled; this balance was paid before the store was closed by his labor in the store. Witness refers to a memorandum from his books in which it appeared that L. M. Ballard had become indebted by his account at the store; witness says there never was a paper, to his knowledge, expressing that $550 had been paid in goods, on the purchase of mill; that there was a paper (the first one) signed by L. M. Ballard, by which the purchase of the mill was entirely on time, to be paid in lumber; we tore up that paper, and changed the trade

because I wanted to make a payment; we drew a new contract showing a payment of $550, and $750 to be paid in lumber; this payment of $550 consisted of a yoke of oxen and some land; since then I have paid all the lumber; the paper here is the identical paper I showed to Mr. Hays.

The foregoing is the substance of the testimony appearing in the record.

G. A. Hanson for Appellants.

S. M. Sparkman and J. B. Wall for Appellees.

The Chief-Justice delivered the opinion of the court.

The first and second grounds of appeal are the allowance of preliminary injunction on bill and petition without oath or other proof of the allegations in either paper, and because no bond was given as required by the order.

Neither of these grounds, if sustained, will be sufficient to remove the final decree, because this appeal was not made until the final decree had been entered, upon the hearing upon bill, answers and testimony. If the allegations of the bill are supported by the testimony sufficiently to overcome the answers of the defendants, the injunction and final decree may stand, even if the orders allowing the preliminary injunctions were erroneously made.

Yet in view of the importance of the proceedings in this case, we ought not to hesitate to say that the allowance of the injunction upon the filing of the bill, and again, upon the petition after the dissolution of the first writ, were unauthorized, if the record sent here is correct.

The oath to the bill was made by one of the counsel, who swears " that the] facts set forth in the foregoing bill are true to the best of his knowledge, information and belief." It does not appear that he had any " knowledge "

of the facts, or that he had any "information" of any kind
from any source, or that he "believed" anything stated in
the bill. He asserts neither. He does not swear to a single
tangible fact showing any knowledge, any information, any
belief whatever. The bill was not supported by the oath
of anybody, and yet an injunction was allowed, restraining
defendants from interfering with a store of goods worth
over two thousand dollars; and the second injunction was
allowed also upon a petition to which no oath was attached.
We are inclined to believe that the record was imperfectly
copied.

Such a verification as was made to the bill, according to
this record, is not sufficient to justify the granting of an
injunction. Bowes vs. Hoeg, 15 Fla., 403. When an in-
junction is granted without the oath of some person to
facts, or to reliable information as to the facts stated in the
bill, it is a matter of course to dissolve the injunction be-
fore answer, and the officer to whom the application for an
injunction is made should require to be annexed to the bill
the additional affidavit of the person from whom the in-
formation is derived, verifying the truth of the information
thus given. Campbell vs. Morrison, 7 Paige, 157 ; Bank of
Orleans vs. Skinner, 9 Pai., 305 ; Horne vs. Moody, 59
Ga., 731.

No receiver was named in the order in this case, but it
appears by the return of the sheriff on the order that he
had taken possession of the store and stock of merchan-
dise. By what authority this was done does not appear.
The presumption is that it was done by some authority of
the court which does not appear in the record. The repu-
tation and credit of no man of business is safe if he is lia-
ble to be enjoined from pursuing his occupation or the care
of his property, and to have a receiver or sheriff put in
possession of his effects upon a creditors' bill alleging fraud

in the most general terms, the truth of which no person asserts on oath.

As to the bond, we simply remark that it does not conform to the order of the court, not having been executed by the complainants, their agent or attorney; nor does it name all the complainants in the suit; nor is it sealed by the obligors; nor was its sufficiency approved. These were faults, but as before remarked, they cannot affect the regularity of the final decree.

It is alleged for error that the testimony of certain witnesses was improperly admitted, as their testimony does not bear against H. D. Ballard. This testimony relates to transactions and declarations intended to show fraudulent and irregular conduct on the part of L. M. Ballard. In this aspect it was competent as against the latter at least. As to the objections to the testimony, and to questions addressed to witnesses on their examination before the referee, the record fails to show that any questions of this character were made upon the hearing; and the omission of the court to rule specifically upon the matter is not the fault of the Judge. No motion appears to have been made to exclude or strike out any portion of the testimony. As the case comes here upon the pleadings and the testimony, we will examine the whole record, and endeavor to give the testimony such weight as we think it deserves.

The charge in the bill is very general. It is, that Louis M. Ballard, being indebted to complainants for goods sold to him in his business as a merchant, combined and confederated with H. D. Ballard, his brother, to defraud complainants, and transferred to his brother his stock of goods without consideration for the purpose of enabling the said L. M. Ballard to defraud complainants, and to evade payment of his just debts, complainants having obtained judgments amounting to $2,296.85, and sued out executions

upon which they can find nothing to levy. The bill requires the defendants to answer certain interrogatories as to the indebtedness, the sale of the goods, for what consideration the sale was made, and whether it was not made to keep his creditors from seizing the stock of goods. This is the whole case made by the bill.

The answers show that prior to the recovery of the judgments, L. M. Ballard was engaged in trade with one English as a copartner, each owning one-half interest in the goods. That the merchandise was of the value of seven hundred dollars, and there was some other property in the store worth fifty dollars. That H. D. Ballard was in similar business at another place, and desirous to remove to the store of Ballard & English he employed L. M. Ballard to purchase the interest of English. That L. M. Ballard purchased the interest of English in the stock for $400, and sold the whole to H. D. Ballard for $750, and delivered the goods to him. That H. D. Ballard paid L. M. Ballard in full for the stock before the filing of this bill, and removed his own stock into the store. The goods so brought in were of the value of $1,821.38, making, with the goods purchased of Ballard & English, a stock of the value of $2,571. That ever since the purchase by H. D. Ballard, February 8, 1882, he has had possession of the goods as his own property, and has been engaged there in his usual mercantile business, until his store was taken possession of by the sheriff in July, 1882, under these proceedings. That H. D. Ballard, before the seizure of the store, had bought for himself, in his own name, and put into the store, other goods of the value of $1,240.84. They deny that the sale by L. M. to H. D. Ballard was fraudulent, or designed to defraud the complainants, or other creditors of L. M.; and aver that the sale was made in good faith, and for a full and valuable consideration; and give a detailed statement

of the consideration paid. Both defendants deny that L. M. Ballard had, at the time of the filing of the bill, or at any time subsequent to the sale, any interest whatever in the stock of goods. In brief, both defendants generally and specifically deny all the equities of the bill.

There was in evidence a written contract, showing that in March, 1882, Louis M. Ballard sold to H. D. Ballard a steam saw-mill and fixtures, oxen, carts, &c., for $1,300, of which $550 was acknowledged to be paid, and the balance to be paid in lumber.

The testimony on the part of the complainants as to the conversations and declarations of the defendants, standing uncontradicted, would go far towards showing that L. M. Ballard still had, after the sale to H. D. Ballard in February, 1882, an interest in the stock of goods, at least to the extent of the value of the goods of Ballard & English; but this testimony is met quite fully by that of each of the defendants, by such explanations and contradictions as are at least plausible; and as the defendants are competent witnesses we must give their statement such weight as should be given to other persons, making due allowance for the fact that they testify in their own interest.

The testimony of English is that the entire business when he went in was about $2,500, and when he went out it was about $1,900 The assets of the firm were the store-house, goods and accounts. He does not say how much he agreed to give for a half interest, but says he paid $500, or thereabouts, in cash, and gave his note for the balance, and when he quit he owed $400 on the note. It was evidently a losing business. The evidence shows that he was paid $400 for his interest in the entire property when he sold out. The amount they owed at the time he sold is not shown. There is no evidence to contradict defendants' statements that the goods in the store were of the value of about $750

when purchased by H. D. Ballard. It is shown that this was paid by H. D. Ballard before the filing of this bill.

The testimony as to what L. M. Ballard said about his embarrassments, and his desire to go into bankruptcy, and saving something for his family, as a reason for running the business in the name of English, was suspicious ; but there is no shadow of testimony showing that H. D. Ballard knew of these facts. H. D. Ballard brought a large stock from the store of Bevill & Co., amounting to over $1,800, and put into the store with the goods he bought of L. M., and afterwards put in other goods purchased of merchants, amounting to $1,140, before the store was closed. The stock inventoried by the sheriff amounted to $2,200, and upwards. H. D. Ballard shows he had other property amounting to over $1,100, at the time he went to Medulla, besides his interest in the Bevill stock, with which he bought his brother's stock and invested in the saw-mill property. His business in the store and mill was profitable up to the time he was closed up, in July, 1882. His brother, L. M., had not been successful in business, but had run largely in debt. In the face of these facts it is difficult to believe that the stock of goods belongs to Louis M. Ballard, the judgment debtor. Hays testifies, and H. D. Ballard admits, that he told Hays that he was not interested in the store ; and Ballard says that is all that he said on the subject. The reason he said it was that he and Hays were running the mill business together, and the mill concern owed the store, and Hays wanted more time on his part of the mill debt, and he didn't want Hays to get in any further. By this means he got a settlement with Hays. Hays does not again appear to contradict any part of this statement. What Ballard said to Booth was that if he gave an order on the store for the oxen, bought for the mill company, he, Ballard, would have to pay the store, and the mill

company was already behind with the store, and he didn't want to pay money for the oxen. Under the circumstances stated, there can be no conclusion that the purchase by H. D. Ballard of the goods of L. M. was fraudulent, and was designed to hinder the collection of the debts of L. M. Ballard.

The decree finds " that the sale by L. M. Ballard of the stock of goods in question was made without consideration, and for the purpose of defrauding the creditors of the said L. M. Ballard ; and it further appearing to the satisfaction of the court that any interest in said stock of goods which may have been owned by the said Hiram D. Ballard had been transferred by him to said Louis, and there is no doubt that the entire stock is subject to the judgments and executions of the complainants," &c.

We cannot agree that the evidence in this record shows that Hiram D. Ballard made a fraudulent purchase of the goods of L. M. Ballard ; nor is there any testimony here from which we can infer that Hiram D. afterwards sold the stock to L. M.

The charge in the bill was a general one of a combination to defraud creditors. The answers of both defendants deny generally and specifically the fraud charged, and show that the transaction was *bona fide*. The facts stated in the answers as to the consideration and the intent are pertinent to the charge made. These answers are not overcome by the testimony in the case. The testimony as to the facts accompanying the sale of the goods and the subsequent conduct of the business fully sustains the answers. Aside from what are shown by Hays to be the declarations of H. D. Ballard to him, there is no testimony throwing suspicion upon the title of H. D. Ballard to the store of goods at the time the bill was filed. The admission or declaration said to have been made to Hays is at variance

with the facts shown by other testimony. "With respect to all verbal admissions they ought to be received with the greatest caution. The evidence, consisting as it does in the mere repetition of oral statements, is subject to much imperfection and mistake; the party himself either being misinformed or not having clearly expressed his own meaning, or the witness having misunderstood him. It frequently happens also that the witness, by unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say." 1 Greenl. Ev., Sec. 200.

The statement which Hays says was made to him by H. D. Ballard was made for the purpose, as Ballard swears, of inducing Hays to pay what he owed, as one of the mill company, to the store.

".The question of fraud is one of motive and intent, and can rarely, if ever, be considered as a single fact; but a conclusion, to be inferred from all the circumstances of the case. In the proof, however, the same general rule prevails in equity as at law ; it is not to be presumed, but must be proved." Wilson vs. Lott, 5 Fla., 317, *per* Thompson, J. One in failing circumstances has a right to sell his property, and of course any one has a corresponding right to purchase. The only limitation upon the exercise of these rights is, that the sale and purchase be in good faith and for a valuable consideration. If the appellant's purchase falls within this rule—if he purchased from the vendor in good faith and for a fair price—it is perfectly immaterial whether the vendor was embarrassed or insolvent, or whether the condition of his affairs was or was not known to the vendees. Barrow vs. Bailey, 5 Fla., 25.

It is said by appellants that because the stock of L. M. Ballard, in the store when he sold it, was exempt from seizure for his debts, there could have been no fraud as to cred-

itors in making the sale. While it is true that any sale or other disposition of the exempt property cannot be a fraud upon creditors, who cannot subject such property to the payment of their demands; (see Bump on Fraudulent Conveyances, 2d Ed., 242, and citations;) yet it does not appear precisely what other personal property was owned by L. M. Ballard, and it cannot be determined whether these goods might have been exempted. The question, therefore, of exemption, does not necessarily enter into the case.

The decree is reversed, and the cause remanded, with directions to dismiss the bill.